OPINION OF THE COURT
Simons, J.
Plaintiff seeks to recover damages for allegedly defamatory statements made by defendant in opposition to plaintiff’s application for a building permit during a public hearing conducted by a New York City Community Board. Defendant contends that his statements were absolutely privileged under the common law and that they were protected speech under the State and Federal Constitutions. We conclude the statements were constitutionally protected and therefore reverse the order of the Appellate Division and grant defendant’s motion for summary judgment dismissing the complaint.
I
The events giving rise to this litigation occurred in the fall of 1988 during a public hearing. Defendant, Robert Von Gutfeld, was one of several persons who spoke in opposition to a proposal by the plaintiff corporation to create a sidewalk cafe adjacent to its restaurant in Manhattan. The restaurant *134 had opened the year before on the ground floor of an apartment building where Von Gutfeld had resided for more than 30 years. At the time the proposal was put forward, plaintiff was leasing its space from Excelsior Associates, owner of one of the building’s four ground-floor commercial condominium units, which, together with the cooperative residential units in the upper floors, comprised a condominium governed by a Board of Managers.
In the months leading up to the public hearing, plaintiff had begun the process of seeking City permission to create its sidewalk cafe. The City Department of Consumer Affairs initially rejected the application because plaintiff had failed to get the approval of the building’s Board of Managers. Subsequently, plaintiff submitted to the Department an affidavit of consent from Excelsior, its landlord. In response, and apparently confused by the document before it, the Department informed the Board of Managers it was proceeding on the application because it had what appeared to be a valid consent. Months later, the Department discovered its error and reversed itself, but it was during this period of confusion about the City’s position that Community Board No. 9, pursuant to the City Charter, held a public hearing on plaintiff’s proposal.
Von Gutfeld had served as president of the condominium’s Board of Managers from March 1985 to June 1988, and at the time of the hearing in October 1988 he was a member of the Board’s Building Committee. During his time as president, he had complained about a number of problems with the restaurant, including smells in the building and parking problems caused by restaurant employees. When he arrived at the hearing, Von Gutfeld filled out a registration statement, indicating that he wished to speak against the sidewalk cafe and stating his belief that the "permit [from Consumer Affairs] is * * * fraudulent.” After plaintiff’s representatives and one neighbor spoke in favor of the project, several persons, including Von Gutfeld, were recognized and stated their objections. The parties now disagree about the transcription of some parts of a tape recording of the hearing, but both sides acknowledge that Von Gutfeld once more raised the problems with smells and parking congestion and complained that the restaurant "denigrated” the building. He went on to say:
"Why do they want to do it? Because they have an illegal lease with Coronet [plaintiff’s prior landlord] that said they could take the sidewalk.”
*135 "Therefore this entire lease and proposition [the word found in plaintiff’s transcript]/composition [the word found in defendant’s transcript] is as fraudulent as you can get and it smells of bribery and corruption.”
He then concluded, "No such permission [from the Board of Managers] has ever been granted and we sure as hell are not going to grant it now,” and then he hit the table with his hand. The audience applauded.
Following the meeting, the Community Board voted against plaintiff’s application. Later, in March 1989, the Department of Consumer Affairs ceased processing the application for the sidewalk cafe when it discovered its error and learned that the Board of Managers had not consented.
Plaintiff subsequently commenced this defamation action alleging that three of Von Gutfeld’s statements were defamatory: his reference to the denigration of the building, his statement about the illegal lease, and his comments about fraud and the smell of bribery and corruption. Von Gutfeld moved for summary judgment, arguing that the statements were absolutely privileged and that as a matter of constitutional law, both State and Federal, the statements identified as defamatory made no factual assertions and were therefore not actionable. Supreme Court denied the motion, finding no absolute privilege and holding that "[i]t cannot be said as a matter of law that the average recipient of these statements would not interpret them as meaning that plaintiff had actually bribed, corrupted or fraudulently obtained the license or permit.” A divided Appellate Division affirmed.
II
Defendant contends first that his comments are protected under the common law by an absolute privilege extended to those participating in judicial, legislative or executive proceedings. Our cases have made clear, however, that absolute privilege is based upon the personal position or status of the speaker and is limited to the speaker’s official participation in the processes of government (Park Knoll Assocs. v Schmidt, 59 NY2d 205, 209; Toker v Poliak, 44 NY2d 211, 219; Andrews v Gardiner, 224 NY 440, 446-447; Restatement [Second] of Torts, ch 25, tit B, Introductory Note to § 585 et seq., at 242-244). An absolute privilege is available only to those who in speaking are discharging a public function arising from the *136 duties of their office (Park Knoll Assocs. v Schmidt, supra, at 209-210). Von Gutfeld, unlike the members of the Community Board, had no office at the hearing, and no absolute privilege attached to his remarks. As a speaker at the public hearing, he may have enjoyed a qualified privilege protecting him from liability in the absence of malice (see generally, Loughry v Lincoln First Bank, 67 NY2d 369, 376; Restatement [Second] of Torts § 598), as the courts below found, but he has not raised that issue before this Court.
Ill
Defendant next contends that his statements were constitutionally protected opinion under both the Federal and State Constitutions. His argument is undifferentiated although, as Immuno AG. v Moor-Jankowski (77 NY2d 235) made clear, this Court perceives the protection afforded by the First Amendment of the United States Constitution and that afforded by article I, § 8 of the New York Constitution to be quite different. Our analysis of defendant’s claims under the two documents, therefore, is made separately following an examination of the governing concerns in this area. As in Immuno, we analyze first the Federal provision, resolving the issue according to our understanding of the holding in Milkovich v Lorain Journal Co. (497 US 1), and then examine defendant’s rights under the State Constitution. Our determination that the order must be reversed rests on our conclusion that defendant’s statements cannot be construed to allege facts under either analysis (see, Michigan v Long, 463 US 1032).
A
Nearly 20 years ago, the Supreme Court handed down its landmark defamation decision in New York Times Co. v Sullivan "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open” (New York Times Co. v Sullivan, 376 US 254, 270). The Sullivan Court recognized that the protections of the First Amendment were designed to assure an " 'unfettered interchange of ideas for the bringing about of political and social change’ ” (at 269, quoting Roth v United States, 354 US 476, 484) and to maintain " 'the opportunity for free political discussion to the end that government may be responsive to the will of the *137 people’ ” (at 269, quoting Stromberg v California, 283 US 359, 369). This scheme of governance embodied in the First Amendment has come to have as its central metaphor the New England town meeting, where citizens can come forward to be heard in a full and free debate of matters of civic concern.
A Community Board hearing of the sort involved in this case is, in essential ways, the urban equivalent of that town meeting. Though the Boards’ recommendations are not binding, the Board is empowered by the New York City Charter (§2800 [d] [17]) to exercise the initial review of land use proposals and to make written recommendations to the City Planning Commission. The conduct of a public hearing is expressly set forth as a step in the Boards’ recommendation process under section 2800. In creating the Community Boards, the drafters of the City Charter obviously intended to give meaning and effect to the constitutional guarantees of individual participation in government by providing convenient local forums through which the wishes of New York City residents could be channeled to the City’s decision makers.
While conscious of their important role in providing protection to individual reputation, the courts since Sullivan have been vigilant about the potential "chilling effect” the threat of defamation actions can have on public debate.[1] Where as here one of the most fundamental forms of citizen participation is implicated, that vigilance is especially well-founded. Because stringent defamation laws — or, more often, the fear of their imposition — can deter and silence people who would otherwise involve themselves in the public debate, the Supreme Court has fashioned broad protection under the Federal Constitution *138 for civic participants, most notably by requiring plaintiffs who are public officials (New York Times Co. v Sullivan, supra) or public figures (Curtis Publ. Co. v Butts, 388 US 130) to show actual malice on the part of the defendant (see also, Gertz v Robert Welch, Inc., 418 US 323).
Implicit in the Sullivan-Gertz line of cases has been the understanding that, when the rules of defamation are drawn too finely, when any erroneous statement is likely to open the statement maker to liability, First Amendment values suffer because would-be communicators, fearing lawsuits, may be reluctant to risk expressing themselves. To avoid that result, and the resulting impoverishment of the public forum, the Court has been willing to allow in some circumstances otherwise valid claims of reputational harm to go uncompensated in order to encourage citizens and media outlets to express themselves freely when matters of public interest are at issue. In the balance to be struck between the State’s interest in protecting its citizens from reputational injury and the Constitution’s requirement that the State not unduly burden its citizens seeking to participate in the fundamental processes of governance, the scale is not even. We have been guided by these same considerations in explicating the scope of the broader protection afforded by our State constitutional provision (see, Immuno AG. v Moor-Jankowski, 77 NY2d 235, 248, supra).
Additionally, the courts have not been unmindful of the pragmatic consideration of the remedies available to plaintiffs outside of litigation. Thus, as the Supreme Court has noted, "[t]he first remedy of any victim of defamation is self-help— using available opportunities to contradict the lie or correct the error and thereby to minimize its adverse impact on reputation” (Gertz v Robert Welch, Inc., supra, at 344). Though used in Gertz to justify creating different and more burdensome rules for public plaintiffs than private ones, the principle has obvious application in the present case, where a public hearing is involved. A public hearing is, in many instances, the embodiment of self-help. The defamed, in the same setting and with the same audience, has the immediate opportunity to air his competing view. Courts should be reluctant to employ their powers to correct errors uttered in the give-and-take of live public debate when there is reason to believe that the give-and-take itself can adequately, and more appropriately, remedy the wrong. In the words of Judge Learned Hand, the First Amendment "presupposes that right conclu *139 sions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all” (United States v Associated Press, 52 F Supp 362, 372; see, New York Times Co. v Sullivan, supra, at 270).
B
Under either Federal or State law, the dispositive question is whether a reasonable listener at the hearing could have concluded that Von Gutfeld was conveying facts about the plaintiff (see, Milkovich v Lorain Journal Co., 497 US, at 20-21, supra; id., 497 US, at 24 [Brennan, J., dissenting]; Immuno AG. v Moor-Jankowski, supra, at 254; Steinhilber v Alphonse, 68 NY2d 283, 290). That is a question for the Court in the first instance (Steinhilber v Alphonse, supra, at 290; and see, Milkovich v Lorain Journal Co., supra). Because falsity is a necessary element in a defamation claim involving statements of public concern, it follows that only statements alleging facts can properly be the subject of a defamation action. The difficult exercise for the courts, and the place where this Court and the Supreme Court diverge somewhat, is the test or method the court applies to determine whether the challenged statement implies facts.
In Immuno (supra, at 245), the Court interpreted Milkovich as, in effect, truncating the widely used methodology first laid out in Oilman v Evans (750 F2d 970, cert denied 471 US 1127). Under the four-part Oilman test, a court was first to define the words as they were commonly understood and, second, ask whether the statement was subject to verification. From there, the court was to examine the full context of the statement and, finally, the broader social context or setting of the communication (Immuno AG. v Moor-Jankowski, supra, at 243). The Court concluded that Milkovich endorsed the first two steps of the Oilman analysis but in place of the last two substituted a “type of speech” test. Only if the expression fell into the narrow category of a protected type of speech (i.e., loose, figurative, or hyperbolic) could the impression that an apparently verifiable assertion was intended (as determined by the first two Oilman factors) be negated (Immuno AG. v MoorJankowski, supra, at 243-245). Thus, we stated (at 245) that “except for special situations of loose, figurative, hyperbolic language, statements that contain or imply assertions of provably false fact will likely be actionable” under Milkovieh. We *140 believed that to be true because the Supreme Court did not expressly consider such contextual factors as the conjectural language and format of the challenged newspaper column, which tended to suggest that the article was opinion and speculative.
The Milkovich Court did, however, endorse an analysis that examined the "general tenor” of the statement. Moreover, it expressly reaffirmed its holdings in Hustler Mag. v Falwell (485 US 46 [no recovery for an ad parody that could not reasonably been seen as stating facts]), Letter Carriers v Austin (418 US 264 [use of the word "traitor” in a literary definition of "scab” was not a basis for a defamation action under Federal labor law]), and Greenbelt Publ. Assn, v Bresler (398 US 6, 14 [the term "blackmail” used to describe a real estate developer’s bargaining position was not defamation when spoken by a citizen at a public meeting or when reported in a newspaper because the term must have been perceived to be "rhetorical hyperbole, a vigorous epithet”]). In referring to those decisions, the Supreme Court examined the general terms of the statement determining, as we believed in Immuno (supra, at 244), that "the imprecise language and unusual setting” would signal to observers that no actual facts were being conveyed.
The Supreme Court’s reaffirmation of the Hustler-Letter Carriers-Greenbelt lines of cases is significant, for when the circumstances and statements here are compared with Greenbelt (supra) and the language used there, the conclusion easily follows that defendant’s statements in this case were hyperbolic. Whether the analysis looks to the "general tenor” of the words, the imprecise language, or the setting in which they were spoken, Greenbelt indicates that defendant’s words were protected speech. The importance of these factors in the analysis is demonstrated by the Court’s treatment of the term "blackmail” in Greenbelt. Nothing on its face suggests that "blackmail” is hyperbolic. To the contrary, it not only can be defined literally but in many circumstances it would clearly be actionable. Thus, it becomes a hyperbolic "type of speech” only by reference to the circumstances or context in which it is used.
The Greenbelt Court recognized as much. Referring to the news accounts of remarks made at a public hearing, the Court stated that "the word 'blackmail’ ”, when spoken "in these circumstances” was not slander (id,., at 13 [emphasis added]) *141 and added: "If the reports had been truncated or distorted in such a way as to extract the word 'blackmail’ from the context in which it was used at the public meetings, this would be a different case” (id., at 13 [emphasis added]).
Applying Greenbelt, the question becomes: What circumstances, in addition to the literal text of the communication, would the reasonable reader or listener perceive and use in determining whether or not a factual assertion was being made? The Greenbelt Court referred to the nature and tone of the City Council sessions where the land development proposal was under official consideration and where citizens made the "blackmail” allegations. "There can be no question,” it said, "that the public debates at the sessions of the city council regarding Bresler’s negotiations with the city were a subject of substantial concern to all who lived in the community. The debates themselves were heated, as debates about controversial issues usually are” (id., at 13). Later, the Court noted that the headlines on the challenged newspaper reports "made it clear to all readers that the paper was reporting the public debates” (id., at 14).
Thus, the relevant circumstances were that (1) that the speakers were citizens, (2) the debate was heated, and (3) the forum was an official governmental session. From these factors, the finding followed that reasonable listeners would not conclude that the speakers were charging the developer with the actual crime of blackmail. Citizens do not by their status invite listeners to make the assumption that they have researched the subject and found facts not generally known to others. Reasonable listeners also are aware that impromptu comments at a heated public debate, unlike official testimony before a governmental subcommittee or even the reading of prepared remarks, are more likely to be the product of passionate advocacy than careful, logically developed reason. Finally, the type of forum is relevant because reasonable listeners arrive armed with the knowledge that the deliberations are in progress, that no expertise is required of those who choose to speak, and that robust, controversial debate is expected and frequently encouraged. In short, reasonable listeners in such circumstances arrive with an appropriate amount of skepticism. They come with the expectation that they are, in all probability, going to hear opinion, much of it unpolished and uninformed. They are not expected to parse carefully each statement for fact and opinion; they are expected to be reluctant to conclude — absent clear clues to the *142 contrary from the words or context — that the statements made are to be heard as objective fact. That reluctance, that skepticism, in large part, defines reasonableness under the circumstances.
Greenbelt (supra) involved a public hearing. Printed newspaper columns (as in Milkovich, supra) differ from a live public debate for purposes of characterizing the reasonable listener/ reader and make the case for protection here stronger. A newspaper column is the product of some deliberation, not of the heat of a moment. Prior to publication, it passes through the hands of professional editors and it thus carries with it the cloak of credibility and authority of the particular newspaper and the profession. Its writers work with the knowledge that the printed word can and will be subjected to close, careful, and repeated reading over time. These undoubtedly are circumstances encouraging the reasonable reader to be less skeptical and more willing to conclude that the report is stating or implying facts garnered by a professional news gatherer and reporter. No like factors are present when a private citizen makes an impromptu speech in a heated public debate.
Applying the Federal constitutional principles of Greenbelt and Milkovich (supra) to the comments made by the defendant here, we conclude his remarks were constitutionally protected. Plaintiff’s allegations on appeal require that we analyze three statements in Von Gutfeld’s remarks: (1) his assertion that the restaurant "denigrated” the building, (2) his claim that the lease and "proposition” or "composition” were fraudulent and smelled of bribery and corruption, and (3) his statement that there was an illegal lease. Our Federal law analysis requires, as we set forth in Immuno (supra), that we begin by, first, looking at the commonly understood meaning of the words and, second, determining whether they are verifiable.
The allegation of "denigration” cannot survive these initial two steps. Whether defined as "cast[ing] aspersions on” or "belittl[ing]” (Webster’s Third New International Dictionary 602) or by any of its other common meanings, the term falls far short of any requirement of verifiability. It does not state such factually ascertainable phenomena as the diminution of real estate values or the rendering of the building uninhabitable. It is no more or less factual than a claim that the restaurant "enhanced” the building, and it cannot support an action for defamation.
*143 Von Gutfeld’s statement that "the lease and proposition [or composition] is as fraudulent as you can get and it smells of bribery and corruption” requires closer scrutiny. Because such words are commonly understood to mean criminal behavior and refer to verifiable acts, the two prongs of the Milkovich analysis are met, and we must look to see whether the statements are "loose, figurative or hyperbolic” or whether the "general tenor” of the Von Gutfeld’s remarks negate the impression of factual assertions (Milkovich v Lorain Journal Co., 497 US, at 21, supra). For the statement to be actionable, we must find that the reasonable listener at the hearing understood Von Gutfeld to be saying that the plaintiff committed fraud and bribery and corrupted City officials or to be implying undisclosed defamatory fact as the basis for the opinion (Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 380; Restatement [Second] of Torts § 566; see, Milkovich v Lorain Journal Co., 497 US, at 12-14, supra). We conclude that the remarks spoken at a public hearing would not be so interpreted by a reasonable listener.
First, we note Von Gutfeld’s choice of the colloquial and loose terms "smells of’ and "fraudulent as you can get” in the challenged statements. This is not the language of someone inviting reasonable persons at a heated public hearing to find specific factual allegations in his remarks. Indeed, the figurative "smells of’ by its nature conveys to listeners that he has no hard facts, only generalized suspicions. We note also that the statements concerning bribery and corruption are devoid of reference to the plaintiff or any other specific actors. None of his statements about the lease or the sidewalk cafe proposal implies knowledge of a specific criminal transaction, let alone the plaintiff’s involvement in such conduct. While he refers at one point to the condominium bylaws[2] and to correspondence from the Department of Consumer Affairs,[3] he does so in support of the simple, and accurate, proposition that it would violate both the bylaws and the laws of the City to allow a sidewalk cafe absent the approval of the condominium Board of Managers, which exercises ownership rights over the exter *144 nal wall that was to be incorporated into the sidewalk cafe.[4] The references do not suggest that he has investigated beyond that or that he has undisclosed knowledge of any actual transaction involving plaintiffs application.
We note as well the general tenor of the remarks. Von Gutfeld’s statement is a rambling, table-slapping monologue, much of it dealing with his past problems with the restaurant and his frustration with the government of New York City. It could not reasonably be heard as a factual presentation on what the plaintiff was doing to get its permit as much as an angry, unfocused diatribe about the restaurant’s presence and life in New York City. Indicative of the statements’ tenor and language is the following passage: “My question is when does the City of New York stop giving away public property? We see all over New York the streets are littered with vendors. They don’t have insurance. Vendors [inaudible] sell toilet seats. Vendors who sell books. All these things at, at whose expense? The public. We’re getting our sidewalks taken away.”
Reasonable listeners come to a public hearing with expectations that the speaker is airing a layperson’s opinion. Nothing about the circumstances of this hearing or Von Gutfeld’s appearance, and certainly nothing about the words uttered themselves, would lead reasonable persons to conclude that they were witnessing a presentation of fact. Thus, given the loose nature of the language, the "general tenor” of the remarks made at a public hearing, and the skepticism a reasonable listener brings to such proceeding, we believe the second statement is not such that a reasonable listener would conclude factual assertions were being made about plaintiff.
The third statement — the allegation that plaintiffs lease was “illegal” because it “said they could take the sidewalk”— comes closest to asserting an objective fact. Unlike the statements about bribery and corruption, the statement about the lease expressly identifies plaintiff as a party to the transaction. If a reasonable listener would conclude that Von Gutfeld was saying plaintiff was engaged in criminal behavior, the statement would be actionable. The plain language of the statement does not support such a conclusion. Even in the *145 unlikely event that a person at the hearing would reasonably believe a private lease governed a public sidewalk, the listener would need to take the further step and believe that the lessee was engaged in criminal conduct by signing and accepting the terms of the document. At worst the statement alleges nothing more than the lease provision is unenforceable. Thus, we conclude that as a matter of Federal constitutional law summary judgment for the defendant is warranted.
C
The defendant’s claim to relief rests on the protections of the State Constitution as well as the Federal. Under the State law analysis articulated in Immuno (supra), Von Gutfeld would also be entitled to summary judgment. In Immuno, we endorsed a methodology derived from Steinhilber v Alphonse (68 NY2d 283, supra) that requires that a court look "at the content of the whole communication, its tone and apparent purpose” (Immuno AG. v Moor-Jankowski, supra, at 254). Designed to avoid "the fine parsing * * * that might now be required under Federal law” (id., at 255), the State law approach was viewed as better able to "assure that — with due regard for the protection of individual reputation — the cherished constitutional guarantee of free speech is preserved” (id., at 256). When the factors discussed above as part of our Federal analysis are considered under a State contextual analysis, it is clear that, to the extent they make up the "content, tone, and purpose” of the communication, they dictate a finding that Von Gutfeld’s speech was a statement of opinion and advocacy and not a presentation alleging objective fact. No useful purpose would be served in articulating the differences between the two approaches when the defendant is able to prevail under the narrower Federal test.
IV
Accordingly, the order of the Appellate Division should be reversed, with costs, defendant’s cross motion for summary judgment dismissing the complaint granted and certified question answered in the negative.
Chief Judge Wachtler and Judges Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
Order reversed, etc.

. In recent years, there has been a rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those who speak out at public meetings against proposed land use development and other activities requiring approval of public boards. Termed SLAPP suits— strategic lawsuits against public participation — such actions are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future (see, e.g., Westfield Partners v Hogan, 740 F Supp 523; Pring and Ganan, Strategic Lawsuits Against Political Participation, 35 Soc Probs 506). In response, New York State enacted a law specifically aimed at broadening the protection of citizens facing litigation arising from their public petition and participation (see, L 1992, ch 767). The statute was enacted after the events of this litigation and is not in issue on this appeal.

. "Well, they can’t take the sidewalk because this book was approved by the state attorney general, and on page 73 this book says that the sidewalk is a common element and only the condo of which I was a member for 3 years can decide if and when they should be moved.”

. "I have the correspondence that says 'No restaurant is to be built unless the condominium board gives permission.’ ”

. At the time of the hearing, however, the City Department of Community Affairs had erroneously reported that it was satisfied that permission had been given. The defendant’s remarks were largely in response to that error.