**HOTEL ST. GEORGE ASSOCIATES,
A Partnership, Plaintiff,**

v.

**Benjia MORGENSTERN, Joan Harris,
William A. Roos and Julia H.
Stanton, Defendants.**

**No. 92 CIV 6960 (CBM).**

United States District Court,
S.D. New York.

April 20, 1993.

Martin Kurlander by Martin Kurlander, Brooklyn, NY, for plaintiff.

Sullivan & Cromwell by Richard H. Klapper, Karen D. Whetzle, New York City, for defendants.

Tenzer, Greenblatt, Fallon & Kaplan by Ira Finkelstein, New York City, for defendant Roos.

## OPINION ON PRE-TRIAL MOTIONS

MOTLEY, District Judge.

Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff moves for the voluntary dismissal of the entire action pursuant to Rule 41(a)(2). Defendants' move for sanctions pursuant to Rule 11 or the inherent power of the court. Defendants' motion for judgment on the pleadings, which this court treated as a motion for summary judgment, is granted. Plaintiff's motion for voluntary dismissal is denied. Defendants' motion for sanctions is denied.

## I. BACKGROUND

This case arises out of a dispute between plaintiff, Hotel St. George Associates, and defendants Benjia Morgenstern, Joan Harris, William Roos, and Julia Stanton, individual members of the Brooklyn Heights Association, Inc. (the "BHA"), concerning the housing of homeless HIV positive individuals and AIDS victims at the Hotel St. George (the "Hotel").

At one time, the Hotel St. George was the largest hotel in New York City. Located in downtown Brooklyn, the Hotel was once patronized by the famous and elite who kept society within its elegant trappings. Since its glory in the 1940s, the clientele of the Hotel St. George has changed. The Hotel now primarily houses the elderly, people who are HIV positive, and people with AIDS. The Hotel has 371 rooms, 300 of which it has offered to the Mayor's Office of Homelessness and SRO Housing (the "Mayor's Office") to contract for and house the homeless and in particular, AIDS homeless. Indeed, the Mayor's Office has recognized that the Hotel is conveniently located and that the charge per room to the City by the Hotel is less expensive than that of comparable hotels which are also providing accommodations for the homeless in other areas of the City. *See* Complaint, Letter of William Roos, March 8, 1991.

The BHA is also a part of Brooklyn history. Founded in 1910, it is the oldest and largest community organization in New York City. The organization regularly presents some of the views of the Brooklyn Heights community to public officials. Led by a board of 30 governors, the BHA has worked with state and city officials and members of the community on such issues as land use, parks, safety, homelessness, sanitation, and traffic.

Plaintiff has named individual members of the BHA as defendants in this suit. Benjia Morgenstern has been a member of the BHA board of governors since 1990. Joan Harris has served as a member of the BHA board of governors since 1985. William Roos, BHA president from mid–1990 to mid 1992, is currently on the BHA advisory board. Julia Stanton served on the BHA board of governors from 1983 to 1988, at which time she resigned her position to become a member of the BHA staff. She is currently the BHA's Executive Director, and as such is responsible for implementing BHA board policy, representing the BHA in discussions with city officials and managing the BHA office.

In the summer of 1990, the New York City Human Resources Administration (the "HRA") began placing homeless HIV positive and AIDS patients at the Hotel on a temporary basis. At this time, the Mayor's Office set a cap of 65 patients for the Hotel. The HRA paid (and continues to pay) the Hotel approximately $840 a month for each AIDS patient housed at the Hotel, which also rents space to the elderly and others, but is largely vacant.

In November 1990, representatives of the BHA met with Ruth Jacobsen, manager of the Hotel, then Councilperson Gereges and his staff, three members of the Brooklyn Heights community, and representatives of the HRA and the 84th Precinct. At the meeting, the HRA discussed the services (including case managers) it was providing to its clients at the Hotel, and the policy of the Mayor's office of setting "caps" to maximize the welfare of HRA and to minimize impact on the community.

In December of 1990, the BHA formed a committee to investigate the facts of the placement, including the need, if any, for improved services to the patients at the Hotel, and possible ways to work with other community groups to assure the provision of those services.

The BHA contacted the Brooklyn AIDS Task Force in early 1991 to request that they provide services to the patients at the Hotel. At the same time, the BHA pressed the HRA for an increase in services to the HRA clients at the Hotel. In reliance on the advice of local AIDS care organizations, on March 8, 1991, defendant Roos, who was then president of the BHA, sent a letter to the HRA urging that it take steps to provide two on-site case managers and an on-site supervisor, and to require additional security at the Hotel. Complaint, Letter of William Roos, March 8, 1991.

In mid-March 1991 the HRA made an unannounced visit to the Hotel and, apparently disturbed by the condition of the patients and the Hotel, froze further patient placements there. In late March, citing concern for its volunteers, the Brooklyn Chapter of the American Red Cross discontinued its meal delivery program at the Hotel, and citing the poor condition of the Hotel, discontinued its referral of displaced families to the Hotel.

In the spring of 1991, Stanton, Executive Director of the BHA, participated in the preparation of the "Report on the St. George," an insert to the BHA newsletter, which discussed the possibility of conversion of the Hotel to permanent residential housing, the placement of HRA clients at the Hotel, and the increase in crimes within the Hotel as reported by the 84th Precinct.

In June 1991, the HRA assigned two on-site case managers to the AIDS patients living at the Hotel. In response, on July 8, 1991, defendants Harris and Morgenstern sent a letter to the HRA thanking it for providing the case managers and informing the HRA of the existence of a Brooklyn Heights coalition aimed at augmenting the HRA's program. Complaint, Letter of Joan Harris and Benjia Morgenstern, July 8, 1991.

In the fall of 1991, defendants Harris and Morgenstern wrote to members of the clergy in Brooklyn Heights to urge them and their parishioners to participate in the provision of services to the HRA clients at the Hotel. As a result of defendants' efforts, holiday meals and a food and clothing pantry were established for the HRA clients. Defendants also enlisted the support of the Brooklyn AIDS Task Force which agreed to provide counseling services to the HIV positive and AIDS patients living at the Hotel.

Throughout the fall of 1991, defendants, the BHA, members of the community, and other community groups met to discuss ways to increase security within the Hotel and to explore various development options for the Hotel that would include space for AIDS patients and the elderly.

In February 1992, the HRA case managers in the Hotel complained to the BHA of the failure of the HRA to provide necessary phone service to the managers and that the easy access to drugs for the HRA clients at the Hotel frustrated the case managers' efforts to persuade clients to move from the Hotel to permanent housing. On March 2, 1992, Morgenstern and Harris sent a letter to the HRA relaying the case managers' concerns.

On February 25, 1992, Barbara Sabol, Administrator and Commissioner of the HRA, wrote to Councilmember Fisher's office to notify him that because of emergency demands for housing, the HRA had exceeded its cap of 65 patients, as set by the Mayor's Office, and had temporarily housed up to 69 patients at the Hotel. Sabol noted that the Mayor's Office had approved exceeding the cap in that instance, and that the HRA would not exceed it in the future. Finally, Sabol noted her appreciation of Fisher's work with the HRA's Division of AIDS Services ("DA"), "the [BHA], the Brooklyn AIDS Task Force, God's Love We Deliver [food service] and other community organizations to provide a range of social and support services to AIDS clients [at the Hotel]." Defendants' Memorandum of Law in Support of their Motion for Judgment on the Pleadings, App. B, Letter of Barbara Sabol, Feb. 25, 1992.

In April 1992, the representatives of the BHA learned that the Hotel—which told the BHA that it was experiencing financial difficulty—was urging the HRA to double the number of AIDS clients in the Hotel. Members of the BHA, including defendants Morgenstern, Harris and Stanton, Councilmember Fisher and others met with Sholom Drizin, an owner of the Hotel, to discuss the proposed increase in HRA referrals. At this meeting, the BHA expressed its concern to Mr. Drizin that the patients already housed at the Hotel were not receiving adequate care. At this meeting, Mr. Drizin stated that plaintiff's financial position made further investment impossible if he could not increase the cap of 65 clients.

The HRA has acknowledged that in July 1992, there were as many as 150 HRA clients housed at the Hotel. There are currently approximately 100 patients housed at the Hotel.

On August 3, 1992, Morgenstern sent a letter to the HRA Division of AIDS Services inquiring as to the status of the case managers and asking whether or not the HRA had a contract for 65 clients with the Hotel. Complaint, Letter of Benjia Morgenstern, Aug. 3, 1992.

## II. Procedural History and Present Status of the Case

On September 3, 1992 the Hotel St. George Associates filed suit in New York state court against defendants in response to their efforts to limit the number of HIV positive individuals and AIDS victims housed at the Hotel St. George and to affect the residents' living conditions. Only two defendants, William Roos and Julia Stanton, were served.

Plaintiff brings this action pursuant to the Civil Rights Act of 1866, 42 U.S.C. Section 1981, 1982, 1985, 1985(3) and 1988; the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, *et seq.*; the New York Executive Law §§ 296 and 297; New York General Business Law §§ 340 and 341, 18 NYCRR Part 303 and the laws of the State of New York.

All four defendants removed the case from the Supreme Court of the State of New York, New York County, to the United States District Court for the Southern District of New York on September 23, 1992. All defendants answered the complaint after removal on October 13, 1992. On November 23, 1993, defendants moved for judgment on the pleadings pursuant to Rule 12(c) on the grounds that the complaint fails to state a claim upon which relief can be granted and on the ground that defendants Morgenstern and Harris were not served. Plaintiff opposed defendants' motion and moves for voluntary dismissal pursuant to Rule 41(a)(2). Defendants also by separate motion urged the imposition of Rule 11 sanctions and sanctions pursuant to the inherent powers of the court.

Plaintiff's counsel, Hyman Braven, died shortly after the case was filed. Plaintiff's present counsel, Martin Kurlander, moved on December 30, 1992 for voluntary dismissal.

Following a hearing on the motions on January 8, 1993, this court granted defendants' motion for judgment on the pleadings which was treated as a motion for summary judgment and informed the parties that this opinion on the motions would follow. The court also instructed the parties to brief the issue of sanctions.

For the reasons discussed herein, defendants' motion for judgment on the pleadings is granted because plaintiff's claims lack both legal or factual basis. Plaintiff's motion for voluntary dismissal is denied. Defendants' motion for sanctions pursuant to Rule 11 and the inherent power of the court is denied.

## III. RULE 12(c), JUDGMENT ON THE PLEADINGS

Defendants move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff moves for the voluntary dismissal of the entire action pursuant to Rule 41(a)(2).[1]

1. Rule 41(a) provides:
 **(1) By Plaintiff; by Stipulation.** Subject to the provisions of Rule 23(e), or Rule 66, and of

any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any

Rule 12(c) provides:

**(c) Motion for Judgment on the Pleadings.** After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Both defendants and plaintiff submitted materials outside the pleadings for the court's consideration.[2] The court excluded none of these materials. These facts put plaintiff on notice that defendants' motion might be treated as a motion for summary judgment. The content of defendants' motion for judgment on the pleadings, which was based on plaintiff's failure to state a claim upon which relief could be granted, also put plaintiff on notice of a possible conversion of defendants' motion to a motion for summary judgment. Therefore, the court treated defendants' motion as one for summary judgment pursuant to Rule 56. *See Vera Krijn v. Pogue Simone Real Estate Co.*, 896 F.2d 687, 689 (2d Cir. 1990) (when matters outside pleadings are not excluded, district court may treat Rule 12(c) motion as motion for summary judgment).

Rule 56(b) provides:

**(b) For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

In considering defendants' motion, the court views the pleadings in a light most favorable to plaintiff and draws all reasonable inferences in favor of the plaintiff as the non-moving party. *MaDonna v. United States*, 878 F.2d 62, 65 (2d Cir.1989) (*citing Falls Riverway Realty, Inc. v. City of Niagra Falls*, 754 F.2d 49, 56 (2d Cir.1985)). The court may not grant a summary judgment motion unless there are no material issues of fact to be resolved that support the non-movants' claims and the movant is entitled to judgment as a matter of law. *Peter Hurwitz v. Joan Lear Sher*, 982 F.2d 778, 780 (2d Cir.1992) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See also Juster Associates v. City of Rutland*, 901 F.2d 266, 269 (2d Cir.1990) (discussing standard for judgment as matter of law pursuant to Rule 12(c)). "Although a court must construe the allegations of a complaint in the light most favorable to the plaintiff, summary judgment is nevertheless proper if, on the facts as alleged, defendant is entitled to judgment as a matter of law." *Town of Orangetown v. Ruckelshaus*, 740 F.2d 185, 190 (2d Cir.1984) (citations omitted).

### A. Discrimination on the Basis of Race

In plaintiff's complaint, plaintiff alleged that defendants' letters and communications with various city and civic organizations were a campaign of harassment and intimidation that was motivated by racial bias against the predominantly Black and Latino residents of the Hotel because defendants' action allegedly resulted in a cap of 65 AIDS and HIV positive residents being set. Plaintiff alleged that these actions violated the Civil Rights

---

time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs …

**(2) By Order of Court.** Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

**2.** Attached to Defendants' Memorandum of Law in Support of their Motion for Judgment on the Pleadings, defendants submitted as Exhibit B a February 25, 1992 letter from Barbara Sabol, Administrator and Commissioner of the HRA to Councilman Fisher's Office. Both defendants and plaintiff, in the affidavits of Karen D. Whetzle and Martin Kurlander, submitted various newspaper articles for the court's consideration.

Act of 1866, 42 U.S.C. Section 1981, 1982, 1985, 1985(3) and 1988; the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, *et seq.;* the New York Executive Law §§ 296[3] and 297[4] (as amended) and 18 NYCRR Part 303.[5]

Plaintiff, however, lacks standing to assert discrimination claims on behalf of the Black and Latino AIDS victims housed at the Hotel. In other words, neither the federal statutes nor the New York statutes provide a cause of action for a property owner or provider of services against members of the community on behalf or residents or potential residents.

■■■■ Viewing all facts in a light most favorable to the plaintiff, as a matter of law, plaintiff has not been a victim of discrimination within the terms of 42 U.S.C. §§ 1981 and 1982, the Fair Housing Act, or New York law. Plaintiff, as a hotel association, has not been discriminated against on the basis of race or sex. For example, plaintiff in its complaint attempted to assert the rights of Black and Latino residents and potential residents. This is not permitted under Sections 1981 and 1982.[6] *See Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (a litigant "must assert his own legal rights and interests," rather than those of third parties). Plaintiff's discrimination claim is also not permitted under the Fair Housing Act which concerns discrimination by providers of housing, such as owners, landlords, and municipal service providers against tenants and potential tenants.[7]

3. New York Executive Law § 296 provides:

2. (a) It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or·amusement, because of the race, creed, color, national origin, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ...

Section 2–a provides:

It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of publicly-assisted housing accommodations or other person having the right of ownership or possession of or the right to rent or lease such accommodations:

(a) To refuse to rent or lease or otherwise to deny to or withhold from any person or group of persons such housing accommodations because of the race, creed, color, disability, national origin, age, sex or marital status of such person or persons.

4. New York Executive Law § 297 provides the procedure for bringing a claim of discrimination under the statute. Section 9 provides:

Any person claiming to be aggrieved by any unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate ...

5. 18 NYCRR Part 303, Prohibitions Against Discrimination, provides:

Section 303.1 Social services district policy. (a) No social services district or official shall establish or apply any policy or practice which would have the effect of discriminating against an individual because of race, color, national origin, age, sex, religion or handicap. This prohibition shall apply to all aid, care, services, benefits or privileges provided directly, or indirectly by other agencies, organizations or institutions participating under contractual or other arrangements....

303.7 Persons with AIDS or infected with HIV. For purposes of this Part, the term handicap includes being diagnosed as having AIDS or HIV infection, testing positive for HIV infection, or being perceived as susceptible to AIDS or HIV infection. Such persons must be protected from discrimination in accordance with all applicable provisions of this Part.

6. Plaintiff also alleges violations of 42 U.S.C. § 1985(3), which merely provides a remedy for violation of designated rights. *Great American Fed. Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979) (section 1985(3) provides no substantive rights itself). Section 1985(3) also requires, among other things, conspiracy toward the deprivation of equal protection of the laws. *Novotny,* 442 U.S. at 372, 99 S.Ct. at 2349.

7. The facts of this case should not be confused with the facts in *Trafficante v. Metropolitan Life Insurance Corp.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). The Supreme Court in *Trafficante* held that a white tenant, as well as a Black tenant, had standing to sue under § 810 of the Fair Housing Act, 42 U.S.C. § 3610 to protest alleged racial discrimination against non-whites in the rental of apartments in the complex in which they resided. The Court held that "the loss of important benefits from interracial associations" was a sufficient allegation of injury by existing tenants to meet standing requirements. The Court noted that "the proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing, as they too suffered," and that the "person on the landlord's blacklist is not the only victim of discriminatory

42 U.S.C. § 3604. New York antidiscrimination laws and regulations are likewise directed at discrimination by housing and services providers rather than community activity. In *Clifton Terrace Assoc., Ltd. v. United Technologies Corp.,* 929 F.2d 714, 721 (D.C.Cir.1991), the District of Columbia Court of Appeals held that the owner of a federally subsidized low-income housing complex, whose residents were predominantly Black, lacked standing to assert claims under Sections 1981 and 1982. The court found that there was an insufficient identity of interest between the landlord and the tenants, and as the tenants themselves were plainly identifiable, they were best able to assert claims on their own behalf.

At oral argument in this case plaintiff conceded that it lacked standing to assert claims of discrimination under either federal law or New York law and that its claims of discrimination were without merit. Therefore, limiting this conclusion to the facts of this case plaintiff's discrimination claims under both New York law and federal law fail because there is neither legal nor factual basis for plaintiff's claims.[8]

## B. Defamation

Plaintiff alleged in its complaint that defendants have publicly and falsely accused plaintiff of failing to maintain adequate security at the Hotel and that defendants had worked to create a perception that there has been an increase in crime in and around the Hotel. Plaintiff alleged that these false accusations have resulted in damages reasonably believed to be in excess of seven million dollars.[9]

Under New York state law, an action to recover damages for defamation must be commenced within one year after the cause of action has accrued (*i.e.,* publication of the defamatory statements). CPLR § 215(3). *See Municipal Training Center, Inc. v. National Broadcasting Corp.,* 87 Misc.2d 1044, 387 N.Y.S.2d 40 (Sup.Ct. N.Y.Co.1976) (one year statute of limitations). Three of the four "publications" about which the Hotel complained occurred in March, May, and July 1991, respectively, and as this action was not commenced until two of the defendants were served on September 4, 1992, the defamation claim with respect to these publications are untimely.

With respect to the fourth publication, the August 1992 letter, plaintiff failed to plead, *inter alia,* the falsity of the publication. *See 600 West 115th Street Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930, 934 (1992) ("[b]ecause falsity is a necessary element in a defamation claim involving statements of public concern ... only statements alleging facts can properly be the subject of a defamation action").

The letter of August 1992 is an inquiry as to the status of the case manager program at the Hotel, an expression of an opinion that such services are needed, and an inquiry as to whether the HRA has a contract with the Hotel. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (expressions of opinion, not fact, cannot be false, and they are therefore protected). Defendants are not subject to plaintiff's defamation claim because they commented, without malice, on a matter concerning gov-

---

housing practices; it is, as Senator Javits said in supporting the bill, 'the whole community,' 114 Cong.Rec. 2706."

In that case, suit was brought against Metropolitan Life Insurance Co., the owner of the apartment complex. The owner of the complex was not a tenant and was not recognized as having standing to sue for racial discrimination. Applying that distinction to this case, if white residents sought to sue the Hotel for discrimination against Black and Latino residents, according to *Trafficante,* they would have standing. But *Trafficante* does not recognize a right of housing providers, whose interests are potentially adverse to their residents, to advocate their residents rights against discrimination.

**8.** Defendants argue that the inflammatory nature of a claim of racial discrimination is indicative of claims brought in a Strategic Lawsuit Against Public Participation, "SLAPP" suit. Defendants argue that the publication of allegations of racial discrimination were intended to harass and intimidate defendants in violation of their right to petition government.

**9.** Plaintiff does not specifically label this second cause of action as a tort for defamation or cite any other statutory basis for this claim. Nevertheless, the allegations that plaintiff assert under its second cause of action describe an allegation of defamation.

ernment policy. *See New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) ("debate on public issues should be uninhibited, robust, and wide-open"); *Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930 (statements made to city officials at public meeting by member of condominium board of managers were protected). Plaintiff conceded at oral argument that there was no basis for any defamation claim. Viewing the facts in a light most favorable to plaintiff, plaintiff as a matter of law has no cause of action for defamation. Therefore, plaintiff's second cause of action fails.

### C. Tortious Interference with Business

Plaintiff alleged that defendants' actions were unlawful and that defendants had tortiously interfered with plaintiff's business relations and ability to provide housing for AIDS victims.

■ Petitions to a governmental agency are privileged under the First Amendment and cannot form the basis of a claim for tortious interference with business interests. *See Fantaco Enterprises, Inc. v. Iavarone,* 161 A.D.2d 875, 876–77, 555 N.Y.S.2d 921 (3d Dep't 1990) (to succeed on a cause of action for tortious interference with prospective business relations or advantage, plaintiff must show that a competing defendant used unlawful means or that the defendant's sole motive was to injure the plaintiff).

■ Furthermore, the tort of interference with business relations requires that the defendants' actions be "improper." *Fantaco,* 555 N.Y.S.2d at 922; *Restatement (Second) of Torts* § 766 comment a. *See also Guard–Life Corp. v. Parker Hardware Mfg. Corp.,*

50 N.Y.2d 183, 187, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980) (improper and malicious behavior required for claim of tortious interference with contract). Defendants as members of a community organization that has been in existence for over ninety years were simply participating in the democratic process by petitioning their government. While defendants' actions in seeking to maintain the cap on the number of homeless HIV and AIDS sufferers at the Hotel may not be laudable, their actions were not improper. A claim of tortious interference cannot be made where, as here, defendants' First Amendment right to petition government outweighs the harm that their actions may have produced indirectly. *See Rudoff v. Huntington Symphony Orchestra Inc.,* 91 Misc.2d 264, 397 N.Y.S.2d 863, 865 (1977) ("right to petition government is privileged and is superior to right to maintain an action for [tortious] interference").

Viewing the facts and the pleadings in a light most favorable to plaintiff, plaintiff, as a matter of law, has no cause of action for tortious interference with business. Plaintiff has shown no impropriety or malice in defendants' actions, and plaintiff has failed to overcome defendants' First Amendment interest. Therefore, plaintiff's claim for tortious interference fails.

### D. Antitrust Claim

■ Plaintiff alleged in its complaint that defendants conspired, combined and arranged to restrain plaintiff's free exercise of their business and have unlawfully interfered with the conduct of plaintiff's business in violation of the Donnelly Act, New York General Business Law §§ 340[10] and 341.[11]

---

10. New York General Business Law § 340 provides:

1. Every contract, agreement, arrangement or combination whereby

A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully interfer-

ing with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void....

11. New York General Business Law § 341 provides:

Every person or corporation, or any officer or agent thereof, who shall make or attempt to make or enter into any such contract, agreement, arrangement or combination or who

As § 341 indicates, plaintiff's fourth cause of action is based on a criminal statute, rather than a civil statute. Plaintiff admitted at oral argument that it had no authority to sue under these statutes. Moreover, plaintiff presented absolutely no evidence that defendants' were attempting to establish a monopoly of any type or even that defendants' competed with plaintiff in any area. Therefore, viewing the facts and pleadings in a light most favorable to plaintiff, plaintiff, as a matter of law, has no antitrust cause of action.

## IV. SANCTIONS

Defendants move for sanctions against the party plaintiff, (and not plaintiff's attorney), pursuant to Rule 11 of the Federal Rules of Civil Procedure and pursuant to the inherent powers of the court. Defendants allege that plaintiff had no legal or factual basis for its claims and that plaintiff brought this action with the intent to harass and intimidate defendants and deprive them of their right to petition public officials.

### A. Rule 11

Plaintiff brought suit originally in New York State Supreme Court. At that time, plaintiff was represented by their attorney, Hyman Braven who died shortly after the suit was filed. Defendants removed the action to federal court. Martin Kurlander subsequently assumed representation of the Hotel.

 Rule 11 states in pertinent part: .... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the plead-

ing, motion, or other paper, including a reasonable attorney's fee.

Thus, Rule 11 is focussed on the signing of specific documents rather than a party's motivation for litigating. *Stiefvater Real Estate, Inc. v. Hinsdale*, 812 F.2d 805 (2d Cir. 1987) (Rule 11 deals exclusively with "the certification flowing from the signature to a pleading, motion, or other paper in a lawsuit," and imposes no continuing duty on the parties or their attorneys) (citation omitted). Defendants' motion for sanctions was prompted by plaintiff's filing of the complaint,[12] an action taken by plaintiff in state court. In fact, defendants made their first request for sanctions in their Memorandum of Law in Support of their Motion for Judgment on the Pleadings before plaintiff had filed any papers in federal court. Rule 11, however, applies to court papers submitted in federal court. *Mareno v. Jet Aviation of America*, 970 F.2d 1126, 1228 (2d Cir.1992) (once a case is removed from state court, Rule 11 applies to papers submitted to the federal court).

 Even though defendants removed the case to federal court, Rule 11 may not be extended to apply to a complaint that was not filed in federal court. *U.S. v. International Brotherhood of Teamsters*, 948 F.2d 1338, 1344 (2d Cir.1991) ("Rule 11 'does not license a district court to sanction any action by an attorney or party that it disapproves of.... Imposition of sanctions must be based on a pleading, motion or other paper signed and filed in federal court....'") (*quoting McMahon v. Shearson/American Express, Inc.*, 896 F.2d 17, 22 (2d Cir.1990)). This is especially true where defendants have removed the case from state court to federal court. *Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986); *Hinsdale*, 812 F.2d at 809.

In *Stiefvater Real Estate, Inc. v. Hinsdale*, the plaintiff brought an action in state court to recover a brokerage commission for finding a purchaser for the defendant's house. The defendant removed the action to federal

within this state shall do any act pursuant thereto, or in, toward or for the consummation thereof, wherever the same may have been made, is guilty of a class E felony ...

**12.** Defendants admitted that their motion for sanctions is motivated by "[t]he true improper purpose of bringing this action [which] was accomplished by filing the complaint." Defendants' Memorandum of Law in Support of their Motion for Sanctions, p. 7 note.

court on the basis of diversity of citizenship. The court granted defendant's 12(b)(6) motion for judgment on the pleadings, treating it as a motion for summary judgment, and granted defendant's motion for attorneys' fees pursuant to Rule 11. The Second Circuit ruled that Rule 11 could not be applied to a complaint filed in state court and removed by defendants:

> [Plaintiff] commenced this action in state court; it was defendants' removal petition that landed it in a federal forum. Therefore, at the time the complaint was signed rule 11 simply did not apply, and the district court had no authority to give it retrospective application.

*Hinsdale,* 812 F.2d at 809. Rule 11, therefore, may not be applied to plaintiff's complaint in this case.

■ Moreover, the signed papers that were filed in federal court, namely plaintiff's opposition to defendants' motion for judgment on the pleadings and motion for voluntary dismissal, do not warrant Rule 11 sanctions. These papers, which do little more than restate plaintiff's view of the facts and background of the case, were a necessary response to defendants' motion and were clearly directed at terminating the litigation.[13]

Therefore, because plaintiff's complaint is immune from Rule 11 sanctions and because plaintiff's actions in federal court do not warrant Rule 11 sanctions, defendants' request for Rule 11 sanctions is denied.

## B. Inherent Sanction Power

■ The district court possesses the inherent power to levy sanctions. Neither the adoption of 28 U.S.C. § 1927, a federal statute authorizing sanctions, nor the Federal Rules of Civil Procedure displace the inherent power of the court to sanction. *Chambers v. NASCO, Inc.,* —— U.S. ——,

111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27, 43, 46 (1991). The court's inherent power includes the authority to sanction where "a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers,* —— U.S. at ——, 111 S.Ct. at 2133, 115 L.Ed.2d at 45 (*quoting Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). *See also Sassower v. Field,* 973 F.2d 75, 80–81 (1992) ("The Supreme Court has made clear that a district court has inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons.") (*citing Chambers,* —— U.S. at ——, 111 S.Ct. at 2132–33, 115 L.Ed.2d at 45). The inherent sanctioning power of the court may be particularly relevant where, as here, "the conduct at issue is not covered by one of the other sanctioning provisions." *Chambers,* —— U.S. at ——, 111 S.Ct. at 2135, 115 L.Ed.2d at 48.

■ The inherent sanctioning power of the court is not without bound, however. Courts must exercise restraint in sanctioning parties. "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers,* —— U.S. at ——, 111 S.Ct. at 2132–33, 115 L.Ed.2d at 45. (*citing Roadway Express, Inc. v. Piper,* 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980). The Supreme Court explained that a "primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers,* —— U.S. at ——, 111 S.Ct. at 2132–33, 115 L.Ed.2d at 45.

■ In *Chambers,* the Court noted that the inherent power of courts to sanction is in some ways narrower than sanctioning power authorized by statute or rules: the inherent sanctioning power is limited to "cases in which a litigant has engaged in bad-faith conduct or willful disobedience of a court's orders." *Chambers,* —— U.S. at ——,

---

**13.** Defendants concede that only the papers filed prior to Mr. Kurlander's assumption of the case warrant sanction:

> Defendants do not suggest that sanction be imposed on Mr. Kurlander.... Mr. Kurlander, when he entered the case, could not cure that defect, which by itself requires that his client be sanctioned. Mr. Kurlander did re-

peat some of the scandalous allegations, and perhaps should have resigned when he could not convince his client to concede that the claims never had merit, but the true cause of the sanctionable action in this case was plaintiff itself.

Defendants' Memorandum of Law in Support of their Motion for Sanctions, at 7 note.

111 S.Ct. at 2134, 115 L.Ed.2d at 46. While plaintiff's complaint in this case is completely devoid of merit, as a matter of law, it is not clear that plaintiff acted in bad faith. While it is certainly possible that plaintiff filed its complaint to silence and harass defendants' into capitulating to its goals of increasing its financial stability by increasing the number of AIDS victims housed at the hotel, it is equally possible that some members of the community were motivated by stereotypical views of the homeless and of AIDS victims in seeking to limit the number of AIDS and HIV positive residents in the Hotel. For example, while the Hotel may not be blameless in its management of the Hotel and mercenary interests, the possibility that HIV positive residents of color may have been made the scapegoat for increased crime in the area precludes a finding, without more, that the Hotel acted in bad faith in bringing this legally baseless action. In *Chambers,* the Court held that sanctions may be appropriate "if a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled.'" *Chambers,* —— U.S. at ——, 111 S.Ct. at 2133, 115 L.Ed.2d at 46 (*quoting Universal Oil Products Co. v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946)). Plaintiff's actions in this case do not clearly constitute fraud or an affront to justice.

Moreover, beyond the mere allegations that plaintiff's suit is a Strategic Lawsuit Against Public Participation,[14] defendants' presented little evidence of plaintiff's bad faith. "A court must ... exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees." *Chambers,* ——

U.S. at ——, 111 S.Ct. at 2136, 115 L.Ed.2d at 48 (citation omitted).

■ In this Circuit, a finding of bad faith requires "a particularized showing of bad faith to justify the use of the court's inherent power." *International Brotherhood of Teamsters,* 948 F.2d at 1345. The Second Circuit has declined to uphold sanction awards absent both " 'clear evidence' that the challenged actions 'are entirely without color, and [are taken] for reasons of harassment or delay or for other improper purposes' " and "a high degree of specificity in the factual findings of [the] lower courts." *International Brotherhood of Teamsters,* 948 F.2d at 1345 (*quoting Oliveri v. Thompson,* 803 F.2d 1265, 1272 (2d Cir.1986), *cert. denied,* 480 U.S. 918 (1987)). There has been no clear evidence of harassment or improper purpose in this case necessary for the levying of sanctions pursuant to the court's inherent power.

Finally, any harassing or improper actions that may have been taken by plaintiff were completed before plaintiff came under the jurisdiction of this court. Plaintiff did not attempt to pursue any of its claims in federal court or delay the litigation in any fashion; rather plaintiff moved for voluntary withdrawal upon the removal of the case from state court by the defendants. Thus, it is unquestionable that plaintiff attempted no fraud, harassment or disobedience while under the jurisdiction of this court. Therefore defendants' motion for sanctions pursuant to this court's inherent power is denied.

## V. CONCLUSION

For the foregoing reasons, defendants' motion for judgment as a matter of law, which this court has treated as a motion for sum-

---

**14.** Defendants allege that plaintiff's complaint is an effort to silence defendants in violation of their constitutionally protected right to speak out and participate in matters of public concern. Defendants note that the tactic of suing community groups and their members to stifle legitimate expression of opinion to the government has acquired the acronym Strategic Lawsuit Against Public Participation or "SLAPP" suit. The New York State Legislature and the New York Court of Appeals have recognized SLAPP suits as an egregious abuse of the judicial process which violates the fundamental rights of those who be-

come targets simply because they have exercised their right to petition. *See* Citizen Participation Act, 1992 N.Y.L. Ch. 767 (effective January 1, 1993) (providing for recovery of attorneys' fees and punitive damages by SLAPP suit defendants); *600 West 115th Street Corp v. Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930 (1992) (noting concern over the use of SLAPP suits, primarily defamation suits, to intimidate or silence those who speak out on public issues). *See also* Anti–SLAPP Law, 1992 Cal. Stat. Ch. 726.

mary judgment, is granted. Plaintiff's motion for voluntary withdrawal is, therefore, denied. Defendants' motion for sanctions, either pursuant to Rule 11 or the inherent power of the court, is denied.