**Abigail STORM and William Callaghan, Plaintiffs,**

v.

**THE TOWN OF WOODSTOCK, NEW YORK, Defendant.**

**Civ. No. 95–CV–785.**

United States District Court, N.D. New York.

Feb. 20, 1998.

See also 1998 WL 807766.

Ricken, Goldman, Sussman & Blythe, Kingston, NY (Alan N. Sussman, of counsel), for Plaintiffs.

Pennock & Breedlove, LLP, Clifton Park, NY (John H. Pennock, Jr., of counsel), for Defendant.

### *MEMORANDUM DECISION & ORDER*

SMITH, United States Magistrate Judge.

### I. INTRODUCTION

By Order dated January 25, 1996, the late Con. G. Cholakis, U.S. District Judge, referred this matter to the undersigned for all further proceedings and the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73 and upon the consent of the parties.

Plaintiffs commenced this civil rights action against the Town of Woodstock and two Town Board members to challenge the constitutionality of a local law and resolution which authorized the erection of restrictive parking signs along a public roadway in Woodstock, New York. By order dated October 31, 1996, the Court dismissed all claims against the two individual defendants and all claims against the Town of Woodstock with the exception of the free exercise of religion claim. On April 30, 1997, at a pretrial conference in which counsel for both parties were present, plaintiffs' counsel withdrew all claims for compensatory damages, preserving only those for injunctive and declaratory relief. Thereafter, commencing on December 2, 1997, the Court conducted a two day bench trial in Albany, New York. The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

### II. FINDINGS OF FACT

Plaintiffs Abigail Storm and William Callaghan are participants in nighttime outdoor events, known as "full moon gatherings", typically held in the Town of Woodstock five to six times a year, weather permitting, on full moon nights. Ms. Storm faithfully attended these gatherings for five years while living in Woodstock and continues to do so, when she can arrange transportation, since moving to Monticello, New York in 1996. Mr. Callaghan, an intermittent resident of Woodstock since 1973, has been regularly attending these events since his most recent return to Woodstock in 1987.

For more than fifteen years, full moon gatherings have been held in Meads Meadow ("the Meadow"), a pasture on Meads Mountain which boasts a remarkable view of the Catskill Mountains. On the nights of full moon gatherings, participants commune at the Meadow in celebration of the full moon. Most arrive around sundown and, throughout the evening, engage in a variety of activities including singing, dancing, and playing musical instruments. While participants strongly discourage alcohol use during these rituals, many smoke marijuana. At some point during the evening, they circle around a bonfire and engage in individual and group prayer, chanting, meditation and reflection, after which they resume singing, dancing and playing music often into the early morning hours.

Meads Meadow, also commonly referred to as "Magic Meadow", has been owned by the Woodstock Guild of Craftsmen ("the Guild") since the 1970's and has traditionally been open to the public for recreational and spiritual enjoyment. Historically, it has been a prime spot for picnicking, hiking and sun-

bathing and, on occasion, has been the site of daytime weddings and other festivities. With the exception of smaller random gatherings, however, full moon gatherings are the only large nighttime events regularly held at the Meadow.

Visitors can access the Meadow either by Meads Mountain Road from the southeast or MacDaniel Road from the northwest. In reality, both roads constitute one physical roadway ("the roadway") which passes by the entrance to the Meadow, situated on the north side. It is unclear exactly where along the road the name changes except that directly east of the entrance the road is referred to as Meads Mountain Road and west of the entrance as MacDaniel Road. Like most mountain roads, the road leading to the Meadow is unilluminated, hilly and winding, with one lane allocated for travel in each direction. Starting at the entrance to the Meadow, however, and extending west for approximately a half-mile, it becomes a straightaway ("the straightaway" or "the MacDaniel Straightaway").

Since it opened to the public, the Meadow has not included a designated parking area. Although there is a small state parking lot a half-mile east on Meads Mountain Road, it is intended for the convenience of people utilizing the State Forest Preserve trails. With the exception of a few unmarked parking spaces adjacent to the entrance, the majority of Meadow visitors, including those attending full moon gatherings, park their vehicles along the north side of the MacDaniel Straightaway. While there are some areas along the straightaway where vehicles can be completely pulled off the travel surface of the road, there are many areas where brush and trees near the road make such parking impossible. During more crowded times at the Meadow, almost always at night, it is common for many vehicles to be parked along the straightaway partially jutting out into the roadway.

In 1989, plaintiffs met on several occasions with members of the Guild's executive board, neighboring residential property owners and town officials to discuss, among other things, several concerns arising out of the nighttime use of Magic Meadow for full moon gatherings. During these meetings, Guild board members and property owners expressed concerns about vehicles parked along the straightaway blocking residential driveways and interfering with traffic on the roadway, as well as about loud noise and overcrowding in and around the Meadow area. Consequently, those who attend full moon gatherings agreed to park their vehicles with all four tires off the road and clear of residential driveways, to stop playing drums after 11:00 p.m. and to not advertise their events.

Despite these discussions, and due in part to nighttime activities in the Meadow unrelated to full moon gatherings, parking and noise problems persisted and incidents of crime increased in and around the Meadow area. Neighboring property owners increasingly complained to Guild board members, the police and the Town Board requesting that action be taken.

In 1993, fearful of the safety and legal ramifications of vehicles parked along the MacDaniel Straightaway at night and in an effort to mollify neighboring property owners, the Guild posted signs prohibiting use of Magic Meadow from dusk to dawn.

Despite their intent, the signs failed to deter people from entering and using the Meadow at night and the Guild never took steps to enforce them. In fact, to date, full moon gatherings, as well as other nighttime activity, have continued at the meadow without interference from the Guild.

On August 16, 1994, on the eve of the 25th Anniversary of the Woodstock Concert scheduled to be held in the neighboring town of Saugerties and in light of continuing complaints by neighboring property owners and the Guild, the Town Board of Woodstock enacted by a 4–0 vote a resolution ("the 1994 Resolution" or "the Resolution") restricting parking near the entrance of Magic Meadow and along the MacDaniel Straightaway. The Resolution read in relevant part as follows:

RESOLUTION: RESTRICT PARKING ON MEADS MOUNTAIN & MACDANIEL ROADS

Offered by Supervisor Mower

Seconded by Councilwoman Kellogg

WHEREAS it is necessary to establish a restricted parking zone on a section of MacDaniel and Meads Mountain Roads because of road configuration and use. The boundaries and zones are as follows:

NO PARKING ANYTIME on the southwest side of Meads Mountain Road continuous onto MacDaniel Road from the Church on the Mount to the intersection of New Keefe Hollow Road.

NO PARKING ANYTIME on the northeast side of Meads Mountain Road continuous onto MacDaniel Road to a point 10 feet west of the entrance to Magic Meadow.

NO PARKING FROM SUNSET TO SUNRISE on the northeast side of MacDaniel Road from a point 10 feet west of the entrance to Magic Meadow west to the intersection of New Keefe Hollow Road.

Aside from the various complaints, the Resolution was passed without any prior written correspondence between members of the Town Board, the Police Department, or any other Town Department, regarding the safety reason or any other need for restricted parking as set forth in the Resolution. As notice of the new parking restrictions, "No Parking Anytime" and "No Parking From Sunset To Sunrise" signs were posted along the corresponding portions of MacDaniel and Meads Mountain Roads.

On or about November 19, 1994, while attending a full moon gathering at the Meadow, plaintiffs parked their vehicles along the MacDaniel Straightaway in violation of the "No Parking From Sunset to Sunrise" signs and were ticketed. Both contested their tickets in court, and after the town attorney determined the Resolution was procedurally defective on the basis that the restrictions should have been imposed only by ordinance or local law, the tickets were withdrawn.

On May 23, 1995, the Town Board held a public meeting to discuss the enactment of proposed Local Law No. 4 which, in addition to authorizing parking restrictions in twenty-six other locations, would restrict parking near Magic Meadow in the same manner as did the 1994 Resolution.[1] Among those present at the meeting to voice their opinions were Guild board members, neighboring property owners and plaintiffs.

During the hearing, then Town Board member Dale Hughes stated that he believed it was disingenuous to say that proposed Local Law No. 4 was solely related to safety concerns and was in no way connected to what was happening on Magic Meadow. He further stated that he wished the Meadow could be used in a public fashion without bothering the Guild and neighbors but went on to say that the Town was not attempting to regulate use of the Meadow and that it was up to the Guild to do so. In addition, he stated his intention to vote in favor of the law because, as a member of the Rescue Squad for three years, he was aware of several accidents and parking complaints on MacDaniel Road and also because there had been complaints of loud noise and increased crime in the Meadow area at night.

Local Law No. 4 was approved by a 5–0 vote. As with the 1994 Resolution, other than the various complaints registered by members of the Guild and neighboring property owners, there was no written correspondence between members of the Town Board and other Town Departments including the Police Department, Fire Department, Rescue Squad and Highway Department regarding the reason or need for restricting parking near Magic Meadow. Additionally, identical parking signs were posted along MacDaniel and Meads Mountain Roads to give notice of the law's parking restrictions.

Since the enactment of Local Law No. 4 in 1995, plaintiffs have continued to attend full moon gatherings at the Meadow and to park along the MacDaniel Straightway in contravention of the restrictive parking signs. Consequently, Mr. Callaghan has received several tickets. While Ms. Storm no longer has a vehicle and thus has not personally received any tickets, her friends who drive

---

1. The Court notes that the language of Local Law No. 4 is identical to that of the 1994 Resolution set forth above.

her to the gatherings have gotten many tickets.

## III. CONCLUSIONS OF LAW

The sole remaining issue in this case is whether Local Law No. 4 violates plaintiffs' First Amendment right to exercise their religious beliefs.[2]

■ "Abhorrence of religious persecution and intolerance is a basic part of our heritage." *Braunfeld v. Brown,* 366 U.S. 599, 606, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). It is a well settled principle, embodied in the Free Exercise Clause of the First Amendment and made applicable to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), that the government cannot enact legislation designed to regulate, impede or discriminate against religious expression. *See Church of The Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *McDaniel v. Paty,* 435 U.S. 618, 626, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978). Specifically, the Free Exercise Clause bars the government from punishing the expression of religious doctrines it believes to be false, *see United States v. Ballard,* 322 U.S. 78, 85–8, 64 S.Ct. 882, 88 L.Ed. 1148 (1944), and from imposing special disabilities on the basis of religious views or religious status. *See Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet,* 512 U.S. 687, 698, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

Traditionally, courts employed a "compelling state interest" analysis to free exercise challenges, pursuant to which governmental action that substantially burdened a religious practice had to be justified by an overriding and compelling public purpose and narrowly tailored to advance that purpose. *See e.g. United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982); *Thomas v. Review Bd. of the Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Yonk-*

*ers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988).

■ However, the Supreme Court, in *Employment Div., Department of Human Resources of Or. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), abandoned the "compelling state interest" test and articulated a new standard for assessing the constitutionality of public laws and policies that may affect religious practice. Under this new test, a law which incidently burdens religious expression is constitutional, whether or not it is based on a compelling public interest, as long as it is both neutral and generally applicable. *See Id.; City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2161, 138 L.Ed.2d 624 (1997). The Court applies the *Smith* test to plaintiffs' free exercise challenge.

### Plaintiffs' Right to Use Magic Meadow at Night:

■ At the outset, the Court rejects defendant's contention that the instant claim should be dismissed on the grounds that plaintiffs have not established a legal right to use Magic Meadow at night. Although the Guild posted signs allowing use of the Meadow only from dawn to dusk, the evidence shows that it has never actually enforced this "daytime use only" policy. The Guild's inaction and the plaintiffs' continued use of the Meadow at night without interference have in turn created an implied right of usage.

### Sincere Religious Beliefs and Practices:

■■ Only beliefs and practices rooted in religion are protected by the Free Exercise Clause of the First Amendment. *See Thomas,* 450 U.S. at 713–14, 101 S.Ct. 1425; *Wisconsin v. Yoder,* 406 U.S. 205, 215–16, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Accordingly, the initial burden is on plaintiffs to show that full moon gatherings are an essential part of their religious and spiritual expression.

---

2. The Court does not consider the constitutionality of the 1994 Resolution since plaintiffs no longer seek compensation for parking tickets they

were issued pursuant to this legislation and they are under no threat of future harm since it was repealed by the Town soon after its enactment.

Resolution of what is a "religious" belief or practice is more often than not an arduous and delicate task and in no way should turn upon judicial perception. *See Thomas,* 450 U.S. at 714, 101 S.Ct. 1425. Even those religious beliefs or practices that appear unacceptable, illogical or eccentric merit First Amendment protection. *See Id.; International Soc'y for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430 (2d Cir. 1981). In determining whether a religious belief or practice is involved, emphasis should be placed on plaintiffs' "inward attitudes towards [the] particular belief system" and great weight should be accorded to their claims that the beliefs and actions in question are an essential part of their religious faith. *Patrick v. LeFevre,* 745 F.2d 153, 157–58 (2d Cir.1984). As with any credibility assessment, the sincerity of plaintiffs' religious claims is evaluated by considering all the evidence presented at trial and appraising plaintiffs' demeanor during direct and cross-examination. *See Id.* at 158–59.

Here, the Court finds that plaintiffs have adequately demonstrated that their participation in full moon gatherings is to them religious and spiritual in nature. In so finding, the Court accords great weight to their forthright testimony at trial. Specifically, Ms. Storm testified that she was a born-again Christian and that she took advantage of full moon gatherings to "encourage people to go to the Lord". In addition, while she testified that every aspect of full moon rituals is spiritual for her, she also stated that her participation in the "circle" and universal "om" chant is a time when she spiritually connects with her fellow gatherers and draws closer to God. Similarly, Mr. Callaghan testified that he views full moon gatherings as a harmonious union among man, nature and the spirit. Both also underscored the religious and spiritual significance of communing at Magic Meadow in view of its beauty, its location on a mountain top and its former use as a Native American ceremonial ground.

Additionally, the Court finds the sincerity of plaintiffs' testimony bolstered by their faithful attendance at full moon gatherings over the years and by their demonstrated commitment to ensuring that they continue unimpeded in the future.

Having found plaintiffs' participation in full moon gatherings is motivated by their spiritual and religious beliefs, the Court next considers whether the defendant has shown that Local Law No. 4 is neutral and generally applicable.

### Neutrality and General Applicability:

A law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice. *See Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595. However, a law failing to satisfy both requirements of neutrality and general applicability must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. *See Lukumi,* 508 U.S. at 531, 113 S.Ct. 2217.

The protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons. *See e.g., Braunfeld,* 366 U.S. at 607, 81 S.Ct. 1144; *Fowler v. Rhode Island,* 345 U.S. 67, 69–70, 73 S.Ct. 526, 97 L.Ed. 828 (1953). If the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral. *See Smith,* 494 U.S. at 878–79, 110 S.Ct. 1595. To determine the object of the law, the Court must first review its text to determine if it lacks facial neutrality by referring to a religious practice without a secular meaning discernable from the language. *See Lukumi,* 508 U.S. at 533, 113 S.Ct. 2217.

A reading of Local Law No. 4 clearly shows that there is no reference whatsoever to any religious practice. However, the Free Exercise Clause extends beyond facial discrimination and "forbids subtle departures from neutrality", *Gillette v. United States,* 401 U.S. 437, 452, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), and "covert suppression of particular religious beliefs." *Bowen v. Roy,* 476 U.S. 693, 703, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986).

The evidence presented does not establish that the object of the local law was to suppress or otherwise adversely impact upon the plaintiffs' religious proceedings and practices at the Meadow. While the problems addressed by the local law, namely, parking congestion, loud noise and increased criminal activity in and around the Meadow area, resulted primarily from the activities of those who use the Meadow at night, the town in passing this legislation was addressing legitimate governmental interests and public concerns.

■■■ Turning to the issue of the general applicability of this legislation, and accepting the hypothesis that the law had the effect of burdening religious practice, albeit to a very minor degree, it must be reviewed to determine whether it "protect[s] religious observers against unequal treatment." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 148, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (Stevens, J., concurring in judgment). Inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation. The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause. *See Lukumi*, 508 U.S. at 542–43, 113 S.Ct. 2217.

■■ The defendant has proven that this legislation advances two interests, public safety and the peaceful enjoyment of their property by neighboring landowners. While adversely impacting upon those who gather five or six times each year for the full moon rituals, the local law and "No Parking From Sunset To Sunrise" signs employed as notice thereof, apply generally to anyone visiting the Meadow at night for whatever purpose. The local law cannot thus be said to impose a prohibition solely upon the full moon gatherers.

The Court thus finds that the local law, satisfying the tests of neutrality and general applicability, does not offend the Free Exercise Clause or any other constitutional principle. It is therefore

ORDERED, that judgment be entered for defendant.