YESHIVA CHOFETZ CHAIM RADIN,
INC., Israel Gruener, and Berel
Shakovin, Plaintiffs,

v.

The VILLAGE OF NEW HEMPSTEAD
BY ITS BOARD OF TRUSTEES OF
THE VILLAGE OF NEW HEMP-
STEAD, Lawrence Dessau, individual-
ly and as Mayor, William Moriarty,
individually and as Deputy Building
Inspector, Defendants.

No. 97 Civ. 4021(LMS).

United States District Court,
S.D. New York.

April 12, 2000.

Dennis E.A. Lynch, Dorfman, Lynch & Knoebel, Nyack, NY, for plaintiffs.

Paul I. Marx, Marx & Aceste, LLP, White Plains, NY, for defendants.

## MEMORANDUM DECISION

SMITH, United States Magistrate Judge.

The plaintiffs, a non-profit religious organization and two individuals who describe themselves as ultra-Orthodox Jews, filed this civil rights action against the Village of New Hempstead, the Village Mayor, Lawrence Dessau, and the Village Deputy Building Inspector, William Moriarty, alleging that the defendants have discriminated against them on the basis of their religious affiliation. The individual defendants are sued in both their individual and official capacities. Pursuant to the provisions of 28 U.S.C. § 636(c), the parties have consented to conduct all proceedings in this case before me.

Plaintiffs allege federal violations under the First, Fourth, and Fourteenth Amendments to the United States Constitution, the Civil Rights Act, 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986 and 1988, and the Fair Housing Act, 42 U.S.C. §§ 3604 and 3612; they also invoke the supplemental jurisdiction of the Court for alleged state law violations of Article I, §§ 1, 3, 8, 9 and 11 of the New York State Constitution, the New York Civil Rights Law § 40–c, and the New York Executive Law § 291. More specifically, plaintiffs assert that the defendants have selectively enforced the Village's zoning laws against the plaintiffs because of their religion, have engaged in bad faith prosecutions against them, and have conspired to do so in violation of federal law. Plaintiffs also allege that the Village Zoning Code itself is unconstitutional, because it fails to provide for fair housing or multi-family dwellings, despite the need for such housing for individuals who must live close to places of worship and schools, and because it contains provisions intended to burden Orthodox Jews.

Defendants have moved for summary judgment on all counts of the complaint, alleging that the zoning code does not violate federal or state law, that it has not been discriminatorily applied, that in any event the individual defendants are protected by immunity, and that the plaintiffs' suit is a "SLAPP" suit subject to heavier burdens of pleading and proof, and should be dismissed on that basis. In response, plaintiffs assert that they have raised valid federal and state constitutional and statutory claims, that triable issues of fact exist which preclude summary judgment, that the individual defendants are not immune, and that New York law on SLAPP suits does not apply to this case.

For the reasons described below, defendants' motion is denied in its entirety.

## STANDARD OF REVIEW PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(c).

In accordance with Federal Rule of Civil Procedure 56(c), "[a] motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 320–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for summary judgment "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos*, 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505). The moving party may rely on the evidence in the record to point out the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548. As noted in *Celotex*, a motion for summary judgment "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c) is satisfied." *Id.*

The responding party must set forth facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). A summary judgment motion cannot be defeated by speculation or conjecture. *See Pollis v. New Sch. for Soc. Research*, 829 F.Supp. 584, 586 (S.D.N.Y.1993) (quoting *Western World Ins. Co. v. Stack Oil Inc.*, 922 F.2d 118, 121 (2d Cir.1990)). Rather, the responding party must show the existence of a disputed material fact in light of the substantive law. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. The responding party must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"In evaluating whether a genuine issue of material fact exists, '[t]he evidence of the non-movant is to be believed,'" *Sim v. New York Mailers' Union Number 6*, 166 F.3d 465, 469 (2d Cir.1999) (quoting *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505), and "a court must resolve all ambiguities, and draw all reasonable inferences, against the moving party." *McNeil*, 831 F.Supp. at 1082 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (*per curiam*) and *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir.1987)). "On a motion for summary judgment, a court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Cronin v. Aetna Life Insurance Co.*, 46 F.3d 196, 203 (1995) (quoting *Donahue*, 834 F.2d at 58 (internal quotes omitted)). "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989)).

## BACKGROUND

The facts that I rely on below are either undisputed or are taken in the light most favorable to the plaintiffs, who are the non-moving parties. Where there is a substantial dispute on a particular fact issue, I

will draw attention to that in my discussion.

This case arises out of the acquisition by the Yeshiva Chofetz Chaim Radin, Inc. ("Yeshiva") of a parcel of land, in the Village of New Hempstead, that was previously owned by the United States military. The property, comprising just under five acres of land, contains twelve three-bedroom homes previously used for army housing. The housing pre-dated formation of the Village of Hempstead. While it does not conform to the current zoning code, which would appear to require subdivision of the lot and to limit the number of units that could be built on the parcel, the plaintiffs contend that the existing buildings and their use are "grandfathered in" as a pre-existing nonconforming use and pre-existing nonconforming structures— the continued existence and use of which are permitted under the zoning code—and that the transfer of title from the United States government to the plaintiffs does not invalidate that status. The Village and the individual defendants, on the other hand, argue that because the land was formerly owned by the United States and was therefore not subject to Village zoning restrictions, but is now being transferred to private citizens, the "grandfathering" provisions do not apply and the current arrangement cannot continue to exist as a nonconforming use. Complicating the picture further is the fact that the buildings are alleged to have contained certain potentially toxic compounds, such as asbestos and lead; the defendants allege that this circumstance increases the urgency of Village oversight of any construction and occupancy on the site.

Against the background of this disagreement in interpretation of the zoning provisions, the defendants took a variety of steps to restrict the plaintiffs' use and occupancy of the property. These steps included, *inter alia*, notifications to the plaintiffs of their alleged violation of the zoning law by failure to subdivide; efforts by the Village building inspector to stop construction work being done on the property, and to prevent the Yeshiva and its members from occupying the entire premises even though work was only being done on a small number of the buildings; efforts to bring county and state health inspectors onto the grounds to stop and/or regulate construction; efforts to convince United States military representatives to stop the Yeshiva's activity on the grounds and to bar them from the property; a communication to the United States representatives, from the Mayor, advising the recipients of a list of purported judgments against the Yeshiva, allegedly sent to discourage the government from selling the property to the Yeshiva; and the filing of an action in state court, by the Village, to enjoin the Yeshiva's activities on the site.

The Yeshiva alleges that many of these actions taken by the Village not only constituted discriminatory application of its laws, but also were undertaken in circumstances in which the Village had no jurisdiction to act at all, since title had not yet passed to the Yeshiva, and thus the plaintiffs' activities on the grounds were subject only to the jurisdiction of the United States government, not the Village.

Finally, plaintiffs allege that the discriminatory application of the Village zoning laws—and in fact the actual passage of certain provisions of those laws, such as the prohibition of multi-family housing and the requirement of a special permit to have two kitchens in one house—were undertaken with the purpose and effect of preventing Orthodox Jews from residing in the Village. In support of these allegations, plaintiffs present affidavits detailing certain statements to that effect allegedly made by the Mayor, as well as other historical evidence assertedly demonstrating discriminatory intent on the part of the defendants.

## DISCUSSION

### I. Defendants' Assertion That Plaintiffs Raise No Triable Issues of Fact.

The Court's task in resolution of this summary judgment motion has been made

immensely more difficult by the failure of the defendants, in their moving papers, to identify the required elements of any of the claims brought against them in this action. While defendants assert that plaintiffs have failed to meet certain standards or establish certain facts in their submissions—arguing, for example, that plaintiffs seek to transform a simple zoning dispute into a claim of federal rights violations, that there is no requirement that Orthodox Jews live in multi-family housing, and that the facts of this case differ from those in *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir.1995), which addressed similar allegations—defendants have simply not identified the ways in which those alleged shortcomings by the plaintiffs relate to each (or any) of the claims before the Court in this case. Defendants do tangentially address some of the constitutional claims made by plaintiffs, asserting that "plaintiffs['] constitutional rights are not without limits" (Memorandum of Law on Behalf of Defendants in Support of Motion for Summary Judgment ("Def.Mem.") at 19) and arguing that "incidental infringements upon religious expression are constitutionally permitted when a legitimate conflict arises." (*Id.* at 20). However, defendants fail to identify or cite the governing standards for First Amendment or Equal Protection violations, and so, of course, fail to identify the ways in which such standards apply to their motion, or the ways in which plaintiffs' submissions do not meet those standards. Nor have defendants distinguished in any way between the state and federal claims in the action, or identified the extent to which the application of their asserted defenses to those distinct claims might vary.

Faced with these omissions, I have undertaken a brief review of the essential elements of the constitutional and Fair Housing Act claims asserted by plaintiffs. As a result of that review I have determined that genuine issues of material fact exist as to each of those claims, and that there is no basis upon which judgment would be warranted for defendants as a matter of law. *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir.1995).

## A. First Amendment Claims.

In *Storm v. Town of Woodstock, New York*, 32 F.Supp.2d 520 (N.D.N.Y.1998), *aff'd* 165 F.3d 15 (2d Cir.1998), the trial court, drawing together many of the primary strands of First Amendment religious protections, explained,

> "Abhorrence of religious persecution and intolerance is a basic part of our heritage." *Braunfeld v. Brown*, 366 U.S. 599, 606, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961). It is a well-settled principle, embodied in the Free Exercise Clause of the First Amendment and made applicable to the States through the fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), that the government cannot enact legislation designed to regulate, impede or discriminate against religious expression. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *McDaniel v. Paty*, 435 U.S. 618, 626, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978). Specifically, the Free Exercise Clause bars the government from . . . imposing special disabilities on the basis of religious views or religious status. *See Board of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 698, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

*Storm, id.* at 526. Under current Supreme Court rulings,

> a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice. Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements

[the neutrality and general applicability requirements] must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest. . . .

At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.

*Church of the Lukumi Babalu Aye*, 508 U.S. at 531–32, 113 S.Ct. 2217 (citations omitted).

The inquiry does not end with the facial text of the law at issue. As the Supreme Court explained,

If the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral. . . . Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs. . . . The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.

*Id.* at 533–34, 113 S.Ct. 2217 (internal quotation marks and citations omitted).

■ In cases reviewed under a First Amendment analytical framework, as in cases scrutinized under an equal protection analysis, the same inquiry that governs alleged "facial" or "covert" constitutional violations is also applied to allegations that a facially neutral law is applied in a discriminatory manner. *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533, 113 S.Ct. 2217 (citing *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953) (municipal ordinance unconstitutional as applied where it was interpreted to prohibit preaching in public park by Jehovah's Witness but to permit preaching during course of Catholic or Protestant service)); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 540, 113 S.Ct.

2217 ("neutrality in its application requires an equal protection mode of analysis") (quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 696, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (Harlan, J., concurring)). Under established equal protection jurisprudence, a decision to enforce or prosecute a law or ordinance "may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,'" *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). "Though the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

■ Accordingly, plaintiffs, to prevail on their Free Exercise challenge against the zoning code provisions prohibiting multi-family dwellings and requiring special permits for second kitchens, must prove at trial not only that these provisions burden their religion or religious practices, but also that "the object of [these provisions] is to infringe upon or restrict practices because of their religious motivations," or that their "purpose is the suppression of religion or religious conduct" or the imposition of "special disabilities on the basis of religious views or religious status." *Church of the Lukumi Babalu Aye*, 508 U.S. at 533, 526, 113 S.Ct. 2217. Defendants, to defeat plaintiff's claims on a motion for summary judgment, must show that there is no genuine issue of material fact as to these issues—that is, that no reasonable juror could possibly find a religiously discriminatory purpose, or a burden upon the plaintiffs.

The plaintiffs also allege that the regular zoning and building provisions were selectively enforced against them; therefore, the plaintiffs must also establish (whether they rely on equal protection or First Amendment analysis) that the law actually was "applied and administered [by the defendants] with ... an unequal hand." *Yick Wo,* 118 U.S. at 373–74, 6 S.Ct. 1064. The defendants' task on summary judgment is to establish that no reasonable juror could find such discriminatory application of the law.

### B. Equal Protection Claims.

 To the extent that the plaintiffs rely on equal protection analysis to argue that the provisions of the zoning law are unconstitutional, they must establish essentially the same requirements as those that apply to their First Amendment claims. Where a zoning law purposely discriminates against a constitutionally-protected minority such as a racial or religious subgroup, that law is subject to the strict scrutiny standard. *See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). However, it is well established that "in order to prove a claim of discrimination in violation of the Equal Protection Clause a plaintiff must show not only that the state action complained of had a disproportionate or discriminatory impact but also that the defendant acted with the intent to discriminate." *United States v. Yonkers Bd. of Educ.,* 837 F.2d 1181, 1216 (2d Cir.1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988); *see also Arlington Heights,* 429 U.S. at 264–65, 97 S.Ct. 555 ("Disproportionate· impact is not irrelevant, but it is not the sole touchstone of an invidious ... discrimination. Proof of ... discriminatory intent or purpose [against the protected minority] is required to show a violation of the Equal Protection Clause" (internal quotation marks and citations omitted)). Again, then, the plaintiff's burden at trial is to show a discriminatory impact as well as intent on the part of defendants to discriminate.

 The Court in *Arlington* reviewed a series of factors, in addition to discriminatory impact, that can be considered by a court to determine whether invidious discriminatory purpose was a motivating factor; the list included (but was not limited to) the historical background of the decision, the specific sequence of events leading up to it, departures from the normal procedural sequence, substantive departures from factors usually considered important by the decisionmaker, the legislative or administrative history (including contemporary statements of decisionmakers), and in extraordinary circumstances, testimony concerning the purpose of official action (subject to the possible limitations of legislative immunity). The Second Circuit has recognized the validity of these factors in evaluating intent in the selective enforcement context, *see Brady v. Town of Colchester,* 863 F.2d 205 (2d Cir.1988), as well as in the context of First Amendment claims, *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 426 (2d Cir.1995), and Fair Housing Act claims. *Id.* at 425. Thus, under each claim, the defendants (to win a summary judgment motion) must establish that no reasonable jury considering these factors could possibly find discriminatory impact or discriminatory motive.

### C. The Fair Housing Act.

 A violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.,* may be established on a theory of disparate impact or one of disparate treatment. *LeBlanc–Sternberg,* 67 F.3d at 425. Plaintiffs assert in the introduction to their Fair Housing Act argument that "The Plaintiffs have stated a valid claim under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Simply stated, Plaintiffs assert Defendants attempted to deny housing in the Village based upon religious reasons." (Plaintiffs' Memorandum of Law In Opposition to Defendants' Motion for Summary Judgment ("Plaintiffs' Mem.") at 22.) To the extent

that this represents a disparate treatment claim, the Second Circuit has held that "a plaintiff can establish a prima facie case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive. If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for non-discriminatory reasons." *LeBlanc–Sternberg*, 67 F.3d at 425 (quotation marks and citations omitted). However, the Second Circuit has also held that under the Fair Housing Act, "the consensus is that a plaintiff need prove only discriminatory effect, and need not show that the decision complained of was made with discriminatory intent.... 'To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in ... discrimination; in other words, that it has a discriminatory effect.'" *United States v. Yonkers Bd. of Educ.*, 837 F.2d at 1217 (quoting *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036–38 (2d Cir.1979)). Thus, the plaintiff's burden on summary judgment would be satisfied by raising an issue of fact either as to the existence of a discriminatory effect resulting from passage or application of the zoning provisions, or as to the existence of animus as a motivating factor in defendants' actions.

### D. The Existence of Triable Issues of Material Fact.

■ To state the elements of these claims, and to summarize the guidelines that apply to their resolution, reveals the inevitable conclusion of a summary judgment motion. Issues relating to the existence of discriminatory motivation, the burden placed on plaintiffs by these laws, and the extent to which plaintiffs' treatment differed from the treatment accorded to others, are quintessentially issues of fact, which this Court is not empowered to decide. Drawing all reasonable inferences in favor of the non-moving parties—that is, the plaintiffs—as I am required to do, I conclude that plaintiffs have raised at least a triable issue of fact on each of these elements. There is no doubt, for example, that plaintiffs have raised an issue as to whether the two-kitchen provisions impact differently upon Orthodox Jews than upon others, and a jury could reasonably question whether the multiple-family housing provisions also create such an impact. Certainly the affidavits reporting allegedly discriminatory comments by the Mayor personally, and his alleged recounting of a past history of intentional discrimination by the Village, present grounds for allowing a jury to judge the credibility, and motivation, of the Mayor (as well as his accusers) on the witness stand, as well as the motivation that can be attributed to the Village itself in passing the disputed provisions. The same is true about the Mayor's decision to send to the Army a list of judgments against the Yeshiva, and about his alleged inability to remember doing so; the allegations raise a triable issue as to motivation, and their resolution is heavily dependent on evaluations of credibility, which this Court may not make.

As far as the extent to which the treatment of plaintiffs by the building inspector differed from the treatment normally accorded to residents working on home improvements, the record is simply not sufficient, on this motion, for me to determine whether such treatment definitively represented the norm rather than an aberration. The written standards in the Zoning Law governing the building inspector's choice of actions are extremely vague; and the plaintiffs suggest various ways in which the procedures in which defendant Moriarty engaged, as well as the reactions of the Mayor and the city's attorney related to the allegations of building code and zoning code violations, may differ from the norm. (This is true even when one considers the defendants' reactions only to alleged *building-code* violations, and is particularly so

in light of plaintiffs' contentions that their property and housing should have been "grandfathered in," and therefore did not violate the *zoning* provisions at all.)

In sum, drawing all reasonable inferences against the moving party and in favor of the plaintiffs, I must conclude that sufficient triable issues exist on each of the elements of these claims to require that defendants' summary judgment motion requesting dismissal of these causes of action be denied.

Defendants have made no arguments in regard to any of the other claims raised by plaintiffs, and therefore there is no basis for this Court to dismiss any of the other claims.[1]

## II. The Immunity Question.

Defendants argue that the individual defendants in this case, as municipal officers, are entitled to immunity, because such immunity applies "for actions taken or decisions made during the course of their employment if those acts are of a discretionary and/or quasi-judicial nature." (Def.Mem. at 24.)

█ However, defendants' arguments make no distinction between the federal and state-law claims in this action, nor do they recognize the distinction between New York's common law immunity principles and the very different guidelines that govern immunity under federal civil rights claims. Consequently, the bulk of their argument, which is based primarily on three New York cases applying New York's common law of immunity to state officials who were defendants in state common law negligence claims, simply is not applicable to the federal claims in the case.

As the Second Circuit explained in *Jobson v. Henne*, 355 F.2d 129 (2d Cir.1966),

> both the language and the purpose of the Civil Rights Acts are inconsistent with the application of common law notions of official immunity in all suits brought under these provisions.... To hold that all state officials in suits brought under § 1983 enjoy an immunity similar to that they might enjoy in suits brought under state law 'would practically constitute a judicial repeal of the Civil Rights Acts.' Furthermore, and perhaps more basically, the purpose of § 1983 as well as the other Civil Rights provisions is to provide a federal remedy for the deprivation of federally guaranteed rights in order to enforce more perfectly federal limitations—on unconstitutional state action. To hold all state officers immune from suit would very largely frustrate the salutary purpose of this provision.

*Id.* at 133 (citations omitted). *See also Tango v. Tulevech*, 61 N.Y.2d 34, 42, 471 N.Y.S.2d 73, 459 N.E.2d 182 (1983) (analyzing state common law claim of negligence against county probation officer under state law immunity principles, but then noting that the public official defendant was "arguably entitled to a qualified immunity under Federal law" in the federal claim under 42 U.S.C. § 1983). The *Jobson* court did recognize the continuing vitality, in suits brought under the Civil Rights provisions, of common law immunity from suit afforded legislative and judicial officers, but noted that the rationale of legislative immunity "should not be extended to suits against state *administra-*

---

1. Defendants, in their reply brief, raise for the first time the question of whether plaintiffs have sufficiently alleged and supported a conspiracy claim under 42 U.S.C. §§ 1985(3). First, I note that raising this issue for the first time in a reply brief is inadequate procedurally, since the plaintiffs were given no opportunity to respond. Second, even if it were true, as defendants contend, that a conspiracy cannot exist between the Village and its officers— an assertion that was not briefed and that I will not decide—it is entirely possible on the facts here presented that the allegation of a conspiracy could be directed to one between the Village officials and one or more "outsiders," such as individuals in the United States military who received the lists of judgments against the Yeshiva or who attempted to bar defendants from the premises.

*tive* officials." *Id.* at 133 n. 10 (emphasis added).

 While defendants do cite one federal case, *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), in support of their argument for absolute immunity, the *Butz* case actually held that federal executive officials exercising discretion, just like state executive officials sued under 42 U.S.C. § 1983, are entitled only to *qualified* immunity in suits for damages arising from allegedly unconstitutional action, "subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business." *Id.* at 507, 98 S.Ct. 2894; *see also id.* at 496–97, 98 S.Ct. 2894 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 247–48, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), for the application of qualified immunity to high officials of the state executive branch, school administrators, and superintendent of a state hospital, respectively); *Harlow v. Fitzgerald,* 457 U.S. 800, 817–18 & n. 30, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (defining the elements of qualified immunity in holding "that government officials performing discretionary functions generally are shielded. from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").[2] The Supreme Court carefully limited the application of such absolute immunity to individuals whose roles were functionally comparable to those of a judge, like grand jurors and prosecutors, and were exercised within systems that provided

safeguards for the potential plaintiff (including insulation of the judge from political influence) that were equivalent to those present in the judicial process. It then determined that modern federal hearing examiners or administrative law judges, and those agency officials performing certain functions analogous to those of a prosecutor, should be able to claim absolute immunity. *Id.* at 512–16, 98 S.Ct. 2894. The roles of building inspector and mayor are not functionally comparable to those of judge or prosecutor—and they certainly are not insulated from political influence—and thus the rationale of *Butz* does not apply. *See also Santangelo v. State,* 101 A.D.2d 20, 28 n. 4, 474 N.Y.S.2d 995 (N.Y.A.D.1984) (noting that the federal test for absolute immunity, which analyzes "whether the official's role is 'functionally comparable' to that of a judge (*Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 57 L.Ed.2d 895 [ (1978) ), [is] a narrower test than that adopted in New York (*see Tango v. Tulevech,* 61 N.Y.2d 34, 471 N.Y.S.2d 73, 459 N.E.2d 182)").

Defendants have presented no argument whatsoever as to whether the individual defendants might be entitled to the qualified immunity potentially available under federal civil rights claims, or as to the standards that should apply to a determination of such immunity; thus, that claim is deemed abandoned.

 Defendants have also failed to present a dispositive statement of New York immunity law even as it would apply to the state claims alleged here. The primary case on which defendants rely, *Rottkamp v. Young,* 21 A.D.2d 373, 249 N.Y.S.2d 330 (N.Y.A.D.1964), *aff'd,* 15

---

**2.** The Supreme Court noted its agreement with the Second Circuit decision below that "it would be 'incongruous and confusing, to say the least' to develop different standards of immunity for state officials sued under § 1983 and federal officers sued on similar grounds under ... the Constitution." *Economou v. U.S. Dept. of Agriculture,* 535 F.2d 688,

695 (2d Cir.1976) (quoting *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 456 F.2d 1339, 1346–47 (2d Cir.1972) (on remand)); *see also Harlow,* 457 U.S. 800, 818 n. 30, 102 S.Ct. 2727, 73 L.Ed.2d 396 (confirming that it would be "untenable" to draw such a distinction).

N.Y.2d 831, 257 N.Y.S.2d 944, 205 N.E.2d 866 (1965), supports the defendants' proposition that a public building inspector in New York, sued under a state common law negligence claim, is immune from liability for a discretionary act even if he or she was motivated by malice, but the case specifically notes that "[a]n exception is made when the right of an elective franchise is denied, and perhaps for the abrogation of civil rights." *Id.* at 376 n. 1, 249 N.Y.S.2d 330. Moreover, the subsequent affirmation by New York's Court of Appeals, in *Tango v. Tulevech, supra,* of the applicability of this state common law immunity rule to actions against public officials, sheds no light on the civil rights question, since the court in *Tango* applied immunity to a common law negligence claim, not to a claimed violation of a state civil rights statute, and the court further determined that no federal right was at issue in that case. Since all the state law claims in this action can fairly be said to allege the "abrogation of civil rights," *Rottkamp* at 376 n. 1, 249 N.Y.S.2d 330, the cases cited by defendants simply do not dispose of the question raised.

In addition, defendants make no mention of the New York cases that have limited the application of the immunity defense even outside of the civil rights context. *See, e.g., Teddy's Drive In, Inc. v. Cohen,* 47 N.Y.2d 79, 81–82, 416 N.Y.S.2d 782, 390 N.E.2d 290 (1979) ("The issue is whether [the public official] ... so abused his official powers that he divested himself of any immunity which otherwise might have shielded him.... [Public officials] are clothed with a limited immunity, while discharging their public responsibility" (*see Rottkamp* [supra]).... But the immunity is not absolute and will not shield a [public official] who, because of his [or her] misfeasance, has stepped outside the scope of his [or her] authority.... The[ ] actions [in this case] amount to misfeasance, and ... defendant is personally liable to [plaintiff] in conversion); *Hladik v. Town of Malta,* 55 N.Y.2d 786, 788, 447 N.Y.S.2d 249, 431 N.E.2d 974 (1981) ("although the individual defendant is referred to as building inspector of the Town ..., this appears to be a description of his official title rather than a characterization of the capacity in which he is sued. The fair intendment of the pleading is to state a cause of action (for conspiracy to defraud plaintiffs) against [defendant] in his individual capacity, beyond the shelter of sovereign immunity").

In the absence of a dispositive statement of the scope and applicability of New York's common law immunity principles to civil rights actions based on New York's statutory and constitutional law, it would not be appropriate for me to conclude that the individual defendants are immune from the state law claims in this action.

Accordingly, for the reasons stated above, the individual defendants' motion to dismiss both the federal and the state law claims on the ground of immunity is denied.

### III. Defendants' Argument That This Is a SLAPP Suit.

The individual defendants claim that the action filed against them by the plaintiffs is a "SLAPP" suit, or strategic lawsuit against public participation, under the laws of New York, and that certain consequences flow from this characterization. Plaintiffs respond that this lawsuit does not meet the requirements of a SLAPP suit, and that even if it did, the consequences would not be applicable in a federal action.

The New York Court of Appeals described SLAPP suits in *600 West 115th Street Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 589 N.Y.S.2d 825, 603 N.E.2d 930 (1992), cert den., 508 U.S. 910, 113 S.Ct. 2341, 124 L.Ed.2d 252 (1993), shortly after New York's SLAPP legislation was enacted. The court explained,

> In recent years, there has been a rising concern about the use of civil litigation, primarily defamation suits, to intimidate or silence those *who speak out at public*

*meetings* against proposed land use development and other *activities requiring approval of public boards.* Termed SLAPP suits—strategic lawsuits against public participation—such actions are characterized as having little legal merit but are filed nonetheless to burden opponents with legal defense costs and the threat of liability and to discourage those who might wish to speak out in the future. In response, New York State enacted a law specifically aimed at broadening the protections of citizens facing litigation *arising from their public petition and participation (see,* L.1992, ch. 767).

*600 West 115th Street,* 80 N.Y.2d at 138 n. 1, 589 N.Y.S.2d 825, 603 N.E.2d 930 (emphasis added).

The SLAPP legislation amended New York's Civil Rights Law and the New York Civil Practice Law and Rules. *See* N.Y. Civil Rights Law §§ 70–a & 76–a; N.Y.CPLR Rules 3211(g) & 3212(h). In the introductory paragraph of the new law, entitled "Legislative findings and purpose," the legislators stated,

> The legislature hereby declares it to be the policy of the state that the rights of citizens to participate freely in the public process must be safeguarded with great diligence. The laws of the state must provide the utmost protection for the *free exercise of speech, petition and association rights, particularly where such rights are exercised in a public forum* with respect to issues of public concern.

1992 Sess.Law News of N.Y.Ch. 767 (A.4299) (McKinney's) (emphasis added).

The new law defined SLAPP suits, authorized defendants in SLAPP actions to bring their own claims for damages (including attorneys' fees) against the plaintiffs, set higher standards of proof for the plaintiffs to meet in actions in which the truth or falsity of defendants' communications was material, and amended New York's Civil Procedure Law & Rules ("CPLR") to make it easier for defendants

in SLAPP suits to win motions to dismiss or for summary judgment under CPLR Rules 3211 and 3212.

The individual defendants now move to dismiss this action based upon the plaintiffs' alleged failure to meet the requirements that SLAPP suit plaintiffs must meet under CPLR Rules 3211(g) and 3212(h). Rule 3212(h), which applies to summary judgment motions, states that motions to dismiss or for summary judgment made under those rules, when brought against SLAPP suits, shall be granted unless the responding party demonstrates that its action or claim "has a substantial basis in fact or law" or is supported by "a substantial argument for an extension, modification or reversal of existing law." CPLR Rule 3212(h). Rule 3211(g), which addresses motions to dismiss, establishes the same standard but requires only a "substantial basis in law." *Id.*

 Defendants have not established that this action should be subject to those constraints. Most fundamentally, they have not even bothered to respond to plaintiffs' argument that Rule 56 of the Federal Rules of Civil Procedure, rather than the provisions of New York's Civil Practice Law & Rules, governs the summary judgment motion before this Court. Even in a diversity action addressing only state claims, the Supreme Court has held that when there is a conflict between federal and state law, "federal courts are to apply state 'substantive' law and federal 'procedural' law.... When a situation is covered by one of the Federal Rules, ... the court has been instructed to apply the Federal Rule," unless the party opposing application of the Rule can demonstrate that the Federal Rule in question "transgresses ... the terms of the [Rules] Enabling Act or constitutional restrictions." *Hanna v. Plumer,* 380 U.S. 460, 471, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). In this action, brought under the federal question (28 U.S.C. § 1331) and federal civil rights

(28 U.S.C. § 1343) jurisdictional statutes, federal claims predominate, and only a small portion of the claims are supplemental state law claims. In this context, a blanket request for the application of state law rules of procedure (particularly without making any distinction between claims) is, to say the least, even less supportable. There is no reason why a federal claim, brought in a federal court for an alleged violation of the plaintiffs' federal statutory or constitutional rights, should be subjected to different standards of pleading or proof than are called for under the Federal Rules. The standards for granting summary judgment motions in the federal courts are clearly established in FRCP Rule 56 and federal case law, *see* Standard of Review Pursuant to Federal Rule of Civil Procedure 56(c), *supra*, and the defendants have made no argument as to why Rule 56 should be superseded by the provisions of New York's CPLR, even in regard to the state law claims. In the absence of any such argument by defendants, I conclude that there is no basis for applying the proof requirements of the CPLR to a summary judgment motion in this federal court.

Moreover, defendants have failed even to establish that this action falls within the substantive parameters of New York's SLAPP statute. Fundamentally, application of the SLAPP statute to this fact pattern—that is, to provide extra protection to state officials who are alleged to have misused state power to violate plaintiffs' constitutional and statutory rights—seems to contradict the intent of the law. The clearly expressed intent of the legislature was to safeguard "the free exercise of speech, petition and association rights", 1992 Sess.Law News of N.Y.Ch. 767, § 1—particularly as exercised by members of the public who are opposing a government action, CPLR Commentary C3211:73—against those who would try to interfere with a citizen's constitutional rights. *See also Gordon v. Marrone*, 155 Misc.2d 726, 736–37, 590 N.Y.S.2d 649

(N.Y.Sup.Ct.1992), *aff'd*, 202 A.D.2d 104, 616 N.Y.S.2d 98 (2d Dep't 1994), *lv. to app. den.*, 84 N.Y.2d 813, 623 N.Y.S.2d 181, 647 N.E.2d 453 (1995) (SLAPP suits are brought to "stop citizens from exercising their political rights" and to "punish the . . . exercise of the right to petition"); *Hotel St. George Associates v. Morgenstern*, 819 F.Supp. 310, 323 n. 14 (S.D.N.Y.1993) (SLAPP suits are recognized as "an egregious abuse of the judicial process which violates the fundamental rights of those who become targets simply *because they have exercised their right to petition*" (emphasis added)); Terry Rice, *Legislation Provides Prompt Review of SLAPP Suits*, N.Y.L.J., December 13, 1993, p. 1, Col. 1 ("By their nature, SLAPP suits run afoul of the 'right possessed by any citizen to express his or her point of view to a government agency'" (quoting *Entertainment Partners Group, Inc. v. Davis*, N.Y.L.J., June 26, 1991, p. 22, col 1 (Sup. Ct.1991)). . . . All persons, regardless of motive, are guaranteed by the First Amendment the right to seek to influence the government or its officials to adopt a new policy" (quoting *Sierra Club v. Butz*, 349 F.Supp. 934, 937 (N.D.Cal.1972))).

To use this legislation to protect *state officials* accused of *violating* constitutional rights through state action appears to stand the purpose of the legislation on its head. Defendants have identified no pertinent fundamental right in which they engaged, or which was curtailed, by Yeshiva's lawsuit. Defendants certainly were not engaging in their right to petition the government; as the defendants themselves stress, they were at all times acting in their roles as representatives and officials of the government, *see* Def.Mem. at 36, as to whom others (such as Yeshiva and the individual defendants) must exercise *their* right of petition. Even the instigation of the state legal proceeding against Yeshiva was undertaken by defendants in their roles as representatives of the government, not as private citizens seeking to petition the government. Neither have defendants alleged that their right of as-

sembly was curtailed. · Furthermore, the lawsuit by Yeshiva does not purport to challenge the *speech* of the defendants; rather, it challenges the *actions* they took under color of state law, including their efforts to stop construction work and to evict the parties from the premises, to the extent that those actions allegedly represented abuses of the *exercise of state power* toward discriminatory ends. Not surprisingly, plaintiffs represent in their brief that "there is no known case law" wherein the SLAPP law was invoked by or applied to a suit against a governmental entity or its officials, Plaintiff's Mem. at 45, and defendants do not dispute this contention.

In sum, since the defendants' rights to free exercise of speech, petition and association were not implicated by Yeshiva's lawsuit, the SLAPP label does not seem to apply. *See Bell v. Little*, 250 A.D.2d 485, 673 N.Y.S.2d 402 (N.Y.A.D.1998) ("the [lower] court properly found that plaintiff's complaint ... did not affect defendant's rights of public petition and participation before public agencies and, accordingly, did not offend Civil Rights Law §§ 70–a and 76–a (*see Harfenes v. Sea Gate Assn.*, 167 Misc.2d 647, 650–51, 647 N.Y.S.2d 329 [N.Y.Sup.Ct.1995] ), much less warrant application of the special summary adjudication standards set forth in CPLR 3212(h)").

Moreover, it is not at all clear that defendants have established, as a matter of New York law, another essential element of a SLAPP suit: namely, that to qualify as a SLAPP suit, an action must be brought by a "public applicant or permittee," defined as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act" from a government body. N.Y. Civil Rights Law § 76–a. *See, e.g., Gill Farms, Inç. v. Darrow*, 256 A.D.2d 995, 682 N.Y.S.2d 306 (N.Y.A.D.1998) (plaintiffs' permit for *ground* spraying did not qualify plaintiffs as permittees, where defendant's challenge was addressed only to *aerial* spraying done by entities hired by plaintiffs; therefore plaintiffs' lawsuit was not a SLAPP suit); *Harfenes*, 167 Misc.2d at 653, 647 N.Y.S.2d 329 (application for Small Business Administration loan did not qualify party as an "applicant" for purposes of a SLAPP statute).

In this case, neither Yeshiva nor the individual plaintiffs have made any application for a zoning or building permit; in fact, their argument is that no such application is required, and they have affirmatively refrained from taking the initiative to engage in any application process. While defendants have asserted that plaintiffs should nevertheless be deemed applicants for SLAPP purposes, the case law does not support this proposition. Even the plaintiff in *Street Beat Sportswear, Inc. v. National Mobilization Against Sweatshops, Chinese Staff and Workers Ass'n, Inc.*, 182 Misc.2d 447, 698 N.Y.S.2d 820 (N.Y.Sup.1999), cited by defendants to support an expanded reading of the definition of applicant, had affirmatively "registered" under New York's Labor Law, was subject to continuing state investigation and oversight as part of the registration process, and could "only operate its business with the permission of the Labor Commissioner"—making the plaintiff, in the view of that court, functionally a permittee. Defendants have not established that New York courts, as a matter of law, consider a plaintiff who has *not* applied for a permit, zoning change, or other entitlement to constitute an "applicant" for SLAPP purposes, simply because the opposing party (or anyone else) contends that the plaintiff *should* have applied for such an entitlement.

In *Harfenes, supra*, cited with approval by the First Department in *Bell, supra*, plaintiffs challenging a purported SLAPP suit argued that "the new [SLAPP] law, as a remedial statute, should be interpreted broadly to cover almost all types of retaliatory lawsuits." *Harfenes*, 167 Misc.2d at 652, 647 N.Y.S.2d 329. That argument parallels the assertions made by defen-

dants in this action, who argue that, notwithstanding the fact that Yeshiva made no applications to the Village, "Yeshiva must be deemed an 'applicant' for purposes of this motion. To hold otherwise would permit Yeshiva to institute what is clearly a SLAPP suit ... and yet avoid the sanction of dismissal as a result of its wilful failure to make the appropriate applications to the Village." Def.Mem. at 35–36. In response to this line of argument, however, the *Harfenes* court said,

> This argument is without merit. The new anti-SLAPP law creates a new right of action for victims of SLAPP suits. It places new restrictions on the ability of public applicants to seek redress from the courts.... As such, the new anti-SLAPP law is in derogation of the common law. It is well established that statutes in derogation of the common law are to be construed narrowly.

*Id.,* 167 Misc.2d at 652–53, 647 N.Y.S.2d 329 (citations omitted).

I believe that the same caution should apply to statutes that may place burdens on a citizen's ability to bring federal civil rights actions against government actors. The expansive application of SLAPP restrictions to such actions, just like the wholesale application of absolute immunity to state official defendants in those actions, would be inconsistent with the purpose of civil rights actions, which is "to provide a federal remedy for the deprivation [by state officials] of federally guaranteed rights in order to enforce more perfectly federal limitations on unconstitutional state action." *Jobson v. Henne,* 355 F.2d 129, 133 (2d Cir.1966). State officials sued for federal civil rights violations are already protected by the defense of qualified immunity in those circumstances in which the reasonableness of their actions entitles them to such a defense. The invocation by state officials of SLAPP guidelines (which are intended to *prevent* the violation of citizens' right to petition) to make it *harder* for citizens to petition the court for redress of constitutional violations by state officials, would "very largely frustrate the salutary purpose of" the civil rights provisions. *Jobson, id.*

For these reasons, the individual defendants' motion to dismiss the claims because they fail to meet the CPLR standards for a SLAPP suit is denied.

## CONCLUSION

For the reasons set forth herein, the motion by all defendants for summary judgment and dismissal of plaintiffs' claims on the ground of failure to raise a triable issue of fact is denied. The motion of the individual defendants, asking dismissal of the action against them on the basis of immunity, is also denied, as is their motion asking for summary judgment and dismissal based on plaintiffs' failure to meet the proof requirements for SLAPP suits under Rules 3211(g) and 3212(h) of the New York Civil Procedure Law and Rules.

**SO ORDERED,**